**In the Matter of Ralph H. ROSS.**

Supreme Judicial Court of Maine.

Argued April 1, 1981.

Decided April 23, 1981.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster by Ralph I. Lancaster, Jr. (orally), Daniel W. Emery, Portland, for Committee for Judicial Responsibility.

Berman, Simmons, Laskoff & Goldberg, P.A. by Jack H. Simmons, Lewiston, (orally), Edward G. Hudon, Brunswick, for Ralph H. Ross.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS, GLASSMAN, ROBERTS and CARTER, JJ.

PER CURIAM.

This is an original proceeding commenced in the Supreme Judicial Court by the filing of a report by the Committee on Judicial Responsibility and Disability.[1] The report alleged that the respondent, Ralph H. Ross, a Judge-at-large of the District Court, has engaged in conduct violative of the Code of Judicial Conduct[2] and recommended that

1. The Committee was established by an order of the Supreme Judicial Court effective July 5, 1978.

2. The Code of Judicial Conduct was promulgated by the Supreme Judicial Court effective April 1, 1974.

discipline be imposed. Immediately upon receipt of the report, this Court issued a procedural order the most significant provisions of which were:

1. The respondent was suspended, until final action by the Supreme Judicial Court, from the performance of judicial duties except to the extent reasonably necessary for the completion of cases already heard in part and then pending before him.

2. The Chief Justice was to designate a single Justice of the Supreme Judicial Court to serve as a hearing Justice to hold such evidentiary hearings as were necessary "and to report to the Court his findings of fact on the issues raised by the Committee's report and respondent's answer."

3. The full Court would receive briefs and hear oral argument after the hearing Justice reported and would "thereupon determine whether the charges, or any of them, have been proved by a preponderance of the evidence, and, if so, the appropriate sanction or sanctions to be imposed."

Pursuant to that order, the Chief Justice designated a single Justice as the hearing Justice in this matter. The report of the Committee, together with copies of the procedural order and the order designating the hearing Justice, was served upon the respondent personally. Thereafter, in accordance with the procedural order, the respondent filed his written answer to the report of the Committee. The hearing Justice held a prehearing conference at which the Committee and the respondent appeared through counsel. At the prehearing conference, it was agreed that this matter should be submitted to the full Supreme Judicial Court on the stipulation of facts submitted to the Committee and the exhibits attached thereto as supplemented by a written motion which had been filed with the Committee. It was further stipulated that an evidentiary hearing would not be required and that the issues to be addressed by the Supreme Judicial Court were:

1. Did the procedure of the Committee violate the due process provisions of the United States Constitution or the Maine Constitution?

2. Did the conduct of the respondent described in the stipulation of facts constitute a violation or violations of the Code of Judicial Conduct?

3. If the Court concludes that the conduct of the respondent did constitute a violation or violations of the Code of Judicial Conduct, what sanctions, if any, should be imposed?

The hearing Justice set times for filing briefs and scheduled the matter for hearing on April 1, 1981, before the full Supreme Judicial Court sitting in exercise of its original jurisdiction, not as the Law Court.

I.

■ The respondent had contended that the procedure before the Committee violated due process in that there were combined in the Committee investigative, prosecutorial and adjudicative responsibilities. At the hearing before the full Court, counsel for the respondent conceded there was no due process violation. This concession was based on a recognition that in this original proceeding before the Supreme Judicial Court the Court would not be functioning as an appellate tribunal, would give no deference to the purported findings and conclusions of the Committee and would independently find the facts and reach the appropriate legal conclusions. We therefore find it unnecessary to engage in any extended discussion of the first issue identified in the pretrial order. The Committee on Judicial Responsibility and Disability functions as an investigative agency similar to a grand jury in criminal proceedings. The report of the Committee is nothing more than a charging document containing the Committee's allegations concerning the conduct of the respondent. The burden is on the Committee to prove those allegations before the full Court. Thus, the Committee performs no adjudicative functions whatsoever but is merely the investigative agency which formally prepares a charging docu-

ment filed with the Supreme Judicial Court. Under such circumstances, there is no due process violation. *See Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1974); Cohn, *The Limited Due Process Rights of Judges in Disciplinary Proceedings,* 63 Judicature 232 (1979).

## II.

Because this is the first occasion which this Court has had to address the problem of judicial discipline where a sitting judge has been charged with misconduct, we note at the outset the extreme sensitivity of the task in which we are engaged. It is axiomatic that an independent and vigorous judiciary is essential as a bulwark to protect the rights of our citizens.[3] An infringement on the independence of the judiciary is an immediate threat to the fundamental concept of government under law. Independence of the judiciary is not inconsistent with accountability for judicial conduct. Lawless judicial conduct—the administration, in disregard of the law, of a personal brand of justice in which the judge becomes a law unto himself—is as threatening to the concept of government under law as is the loss of judicial independence. We see no conflict between judicial independence and judicial accountability. Indeed, a lack of judicial accountability may itself be the greatest danger to judicial independence.

We are aware that judicial accountability does not require that judges be mere robots or be of precisely the same character with precisely the same personal qualities and attitudes. There is room in a judiciary which serves a pluralistic society for differences in judicial style. There is room for the colorful judge as well as the more conventional judge. Differences in style and personality do not of themselves suggest

misconduct. To the end that a courtroom may truly be a temple of justice and not the personal domain of the man or woman who happens to be presiding, any differences in style must always result in justice administered according to law and must be in accord with minimum standards of propriety. To establish such minimum standards of conduct and propriety, we promulgated the Code of Judicial Conduct in 1974. It is against this Code that allegations of judicial misconduct must be measured.

In this case there are no factual disputes. The matter was submitted to the Court upon a stipulation of facts, agreed to by both parties, which details the conduct of the respondent. Thus, we need not engage in a fact-finding process. Rather, we are engaged in the delicate task of applying to the admitted facts the legal standards found in the Code of Judicial Conduct to determine whether the admitted conduct of the respondent has violated the Code. Before discussing the specific conduct of the respondent, we must emphasize that there is neither an allegation nor a suggestion that in any of these matters Judge Ross acted for personal gain or benefit. For ease in description, we will group similar allegations of misconduct and will treat each group separately.

### A.

■ In two of the matters, the respondent imposed sentences of imprisonment without affording the persons sentenced the hearings to which they are entitled by law. In these two matters, the Court concludes that the respondent violated Canons 2(A),[4] 3(A)(1)[5] and 3(A)(4)[6] of the Code of Judicial Conduct.

3. *E. g.,* "[t]he complete independence of the courts of justice is peculiarly essential in a limited Constitution." The Federalist No. 78 (A. Hamilton).

4. "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Code of Judicial Conduct, Canon 2(A).

5. "A judge should be faithful to the law and maintain professional competence in it." Code of Judicial Conduct, Canon 3(A)(1).

6. "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law ...." Code of Judicial Conduct, Canon 3(A)(4).

On or about October 17, 1979, Jeffrey L. Powell appeared in the District Court in Springvale, Maine, and admitted to having committed a civil violation, possession of a usable amount of marijuana, in violation of 22 M.R.S.A. § 2383. The respondent sentenced Powell to pay a forfeiture of $100 and further ordered him, in default of payment, to be imprisoned to serve out that fine at the rate of $10 per day. Powell left the courtroom and, in the presence of court officers and others, made vulgar and derogatory statements about the respondent. A court officer reported these statements to the respondent including the words "fucking dink." The respondent had Powell recalled to the courtroom and in vulgar, abusive and intemperate language increased the forfeiture from $100 to $200 and changed the per diem rate for serving out the forfeiture from $10 per day of confinement to $5 per day of confinement.

The judgment was illegal in several respects: In the first place, the only penalty provided for a civil violation is a fine, penalty or forfeiture. 17–A M.R.S.A. §§ 4(3), 4–A(4). Even in criminal proceedings it is unconstitutional to imprison a defendant for failure to pay a fine without a showing that the defendant willfully failed to pay the fine having the financial ability to do so. See Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971). M.D.C.Civ.R. 80H(i) provides: "Judgments in civil violation proceedings shall be enforced as in other civil actions."

Secondly, it is apparent that the respondent increased Powell's fine and charged the per diem rate to lengthen the term of imprisonment because of what the respondent considered to be contumacious conduct. The procedure for dealing with contumacious conduct evidencing disrespect for a court is specified in M.R.Crim.P. 42 made applicable in the District Court through M.D.C.Crim.R. 42. If the judge sees or hears the conduct constituting the contempt and if the conduct was committed in the actual presence of the court, the judge may punish the contempt summarily. M.R. Crim.P. 42(a). An order of summary contempt must recite the facts constituting the contempt and contain a certificate by the judge that he saw or heard the conduct and that it was committed in the presence of the court. Id. Such an order is appealable. A criminal contempt not seen or heard by the judge and not committed in the actual presence of the court must be prosecuted on notice and after hearing. M.R.Crim.P. 42(b); In re Bernard, Me., 408 A.2d 1279 (1979). Here, without any attempt to comply with either the summary procedure provided in M.R.Crim.P. 42(a) or the plenary procedure required in this case by M.R. Crim.P. 42(b), the respondent entered a judgment the effect of which was to impose an additional thirty days of imprisonment for no reason other than that the defendant had engaged in what was alleged but not proven to be contumacious conduct. It is not asserted, as it could not be, that the respondent was unacquainted with the requirements of the law. Rather, the record is clear that the respondent willfully disregarded the requirements of the law.

On October 23, 1979 at 9:00 a.m. in a divorce action entitled Linscott v. Linscott, a hearing was scheduled in District Court at Bridgton on the wife's post-judgment motion seeking to have the defendant-husband held in contempt. The respondent had presided in this divorce action from its commencement and had issued several orders including the divorce judgment. Because of court commitments elsewhere, the respondent was unable to attend the scheduled hearing; no advance notice of his unavailability had been given to the parties. The wife's attorney was present at 9:00 a.m. at the court in Bridgton. The defendant arrived without counsel sometime between 9:15 and 9:30 a.m. The wife's counsel called the respondent on the telephone and spoke with him. The respondent then spoke with the defendant, Mr. Linscott. In the course of the conversation with Mr. Linscott, the respondent asked him if he was going to comply with an order of the court. Mr. Linscott said he would not. The respondent warned Mr. Linscott of the consequences of his failure to comply. The respondent then instructed the wife's coun-

sel to prepare an order finding Mr. Linscott in contempt of court.

Under date of October 23, 1979, the respondent entered the order which had been prepared by the wife's counsel. That order falsely asserted that a hearing had been held on October 23. It contained "findings of fact" running over two pages and found the defendant Linscott to be in contempt of the court's prior order of May 15, 1979. It directed that Linscott be confined in the Cumberland County Jail in Portland, Maine, until he had purged himself of contempt by performing a series of acts set forth in the order. Linscott was arrested and confined in the Cumberland County Jail pursuant to this order from October 24, 1979 until November 1, 1979 when he was released by order of a Justice of the Superior Court.

■ It is the contention of the respondent that the telephone conversation he had with counsel for the wife and the defendant Linscott constituted a hearing. This contention must be rejected. An evidentiary hearing is a formal proceeding in court. Before a hearing on a contempt citation may result in the incarceration of the individual cited, there must be proof through sworn testimony that there has been a willful failure to comply with a court order by an individual having the ability to comply. *See Yoder v. County of Cumberland*, Me., 278 A.2d 379 (1971). Although the order issued by the respondent contains a lengthy recitation of facts alleged to have been found, there was no evidentiary base for these findings. If conduct such as this is to be permitted, there is nothing to prevent a judge, as a result of a telephone call or a chance encounter on the street, without even a semblance of the hearing mandated by both the United States and the Maine Constitutions, from issuing an order which results in the deprivation of a citizen's liberty.

### B.

■ The respondent improperly sought to interfere with the processes of the Committee on Judicial Responsibility and Disability by seeking to influence one of the witnesses before the Committee. This was a violation of Canon 2(A) of the Code of Judicial Conduct.[7] One of the individuals reporting the Powell incident to the Committee was Lt. Steven L. Lambert, Commanding Officer, Troop A, Maine State Police Barracks, Scarborough. In April of 1980, the respondent visited Lt. Lambert at his office in Scarborough. At Lt. Lambert's request, Lt. Trask was brought into the conference. During the meeting, the respondent referred to two troopers who had been transferred because of some trouble. The respondent told Lt. Lambert that he had better get a good lawyer because he was going to sue him for libel and slander. On the way out of the office, the respondent suggested to Lt. Trask that he talk to Lt. Lambert and see if he wouldn't change his mind. On April 30, the respondent called Lt. Trask and asked him if he had heard anything from "his friend."

The respondent contends that the purpose of his meeting with Lt. Lambert related to other allegations of misconduct made by Lt. Lambert that were withdrawn by the lieutenant after further investigation. Even if true, that contention is of no significance. The fact is that the respondent was aware that a proceeding was pending before a committee established by this Court to investigate allegations of judicial misconduct. For a judge who is the subject of an inquiry before the Committee to seek to impede the processes of the Committee by intimidating witnesses, no matter how false the accusations against the judge may be, demonstrates a complete disregard of a judge's obligation to the public. If the allegations were false, their falsity would be demonstrated through the ordinary processes of the Committee and of this Court. A judge has no right to seek to evade those processes through the intimidation of witnesses. We do not suggest that a judge is deprived of his ordinary civil remedies should he be the victim of false and malicious accusations, but the interests of the

---

7. *See* note 4 *supra*.

public in assuring that allegations of misconduct are thoroughly investigated through the processes established by this Court require that a judge not use the threat of such civil remedies to influence witnesses before the Committee.

### C.

∎ In two instances, because of personal acquaintanceship with the individuals charged, the respondent caused complaints charging traffic infractions to be "filed,"[8] thereby violating Canons 2(B),[9] 3(A)(1),[10] 3(A)(4)[11] and 3(C)[12] of the Code of Judicial Conduct.

In one case, the respondent was asked by Harry T. Mavrakos, whom he had known all his life, if there was anything the respondent could do to prevent the conviction of Mavrakos's son, John, of a speeding offense since a conviction would result in loss of John's license and would increase his insurance costs. The respondent said he would see what he could do. On or about October 17, 1979, the respondent told Officer Arthur B. Titcomb III of the Sanford Police Department that John Mavrakos, charged by Officer Titcomb with operating a motor vehicle at a speed of 40 miles per hour in a 25-mile-per-hour zone, would, if convicted, lose his license and be required to pay an increased insurance premium of $1,000. The respondent also told Officer Titcomb that young Mr. Mavrakos, age eighteen,

should be given a break by "filing" the complaint. Officer Titcomb concurred in the "filing" of the complaint. The respondent then asked Harry Mavrakos to bring his son to the respondent's residence the following Saturday. At that time the respondent lectured John Mavrakos on the evils of speeding.

In another case, the respondent caused a complaint charging Larry W. Doyle with the offense of squealing tires to be rescheduled to a date when the respondent would be presiding in the District Court in Springvale. On or about December 26, 1979, the respondent spoke with the arresting officer, Trooper Dean A. Knight, and told him that Doyle was "not a bad kid" and that he had known him all his life. The respondent also told the trooper that, because of Doyle's other problems, the charge of squealing tires should be "filed" and in fact caused the complaint to be "filed" with Trooper Knight's concurrence.

Concerning the Mavrakos matter, Judge Ross wrote to the Committee expressing his personal views as follows:

> I believe that filing, coupled with the threat of substantial punishment if there should be any type of re-occurrence is a very effective tool and promotes respect for the law and also has a rehabilitation effect.
>
> . . . .

8. The practice of "filing" complaints in criminal cases and civil violations in the District Court is authorized by 4 M.R.S.A. § 173(1) (amended, P.L.1975, ch. 731, secs. 5, 6). Whether this statute authorizes the "filing" of traffic infractions is open to some question since the amendment removed any reference to traffic infractions. P.L.1975, ch. 731, sec. 5. The process of "filing" is described in *State v. Fixaris* Me., 327 A.2d 850 (1974).

9. "A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him." Code of Judicial Conduct, Canon 2(B).

10. "A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, pub-

lic clamor, or fear of criticism." Code of Judicial Conduct, Canon 3(A)(1).

11. "A judge . . ., except as authorized by law, . . . should not permit *ex parte* communications intended to influence his judicial action." Code of Judicial Conduct, Canon 3(A)(4) (emphasis in original).

12. "(1) A judge should disqualify himself in any proceeding in which he has reason to believe that he could not act with complete impartiality, or in a proceeding in which his impartiality might reasonably be questioned.

"(2) A judge should promptly inform the parties in any proceeding concerning any matter which might reasonably cause his impartiality to be questioned." Code of Judicial Conduct, Canon 3(C).

I believe that this kind of action and these kinds of lectures are worthwhile and do accomplish the goal. I believe that merely finding someone guilty and sentencing them to pay a fine may be ineffective in terms of future conduct whereas the threat of future penalty may be very effective.[13]

Whether one finds Judge Ross's personal philosophy acceptable is, of course, not the question. Under his oath, a judge is required to administer the law, not his personal philosophy.[14] The concept of equal justice under law becomes meaningless if some persons receive the benefit of a judge's personal philosophy on the basis of their personal acquaintance with the judge while others who have no such relationship with a judge are dealt with according to law.

### D.

■ In two instances, the respondent used abusive, intemperate and vulgar language against persons before him in violation of Canon 3(A)(3) of the Code of Judicial Conduct.[15] The first such instance is the Powell matter described above. As noted, when the respondent was informed of the insulting language used by Powell outside the courtroom, the respondent had Powell brought back into the courtroom. The best description of what then occurred is contained in the respondent's written response to the Committee as follows:

I then laid him out in lavender, so to speak. He was informed that the Court did not relish the idea of being called a "dink" and that he would be shown the Court always tries to be fair; however, the Court could really be a "dink". The defendant was then and there informed that the fine was no longer $50.00 [sic],

but rather $200.00, and he had a choice to pay his fine or serve it at $5.00 per day. The Court further added, "Young man, you will remember that the likes of you I chew up and spit out before breakfast, and I never have breakfast until 8:00 o'clock at night." [16]

On or about December 14, 1979, in the District Court in Biddeford, the respondent presided at a hearing on a petition for protective custody occasioned by allegations of sexual child abuse brought against Leo R. Desrosiers, the father of the allegedly abused children. In his response to the Committee, the respondent described what occurred in the courtroom as follows:

I did lecture Mr. Leo R. Desrosiers, Sr., rather sternly, in open court. Let us remember that Mr. Desrosiers does not hold a Ph.D. in English; therefore, it was incumbent upon me to address him in such language that he would understand loud and clear.

All parties were in Court Room No. 2 and I told Mr. Desrosiers that whereas Mrs. Desrosiers was expecting her third child at the end of April that the matter would stand continued finally until June 17, 1980 at 9 a. m.

I further pointed out to him that the matter would be recorded, that the District Attorney or an assistant would be present. It could well be that you will find yourself in Thomaston. I also pointed out to him that in some parts of the world people who abuse children are hung like an apple. My final remark was a French "patois" which I translated—well, knowing, that Mr. Desrosiers would get the message. Should you get any urges you would do well to remember your five (5) brothers.

---

13. Judge Ross's written responses to the Committee were attached to the stipulation submitted to the Court and by the terms of the stipulation are the equivalent of his testimony.

14. The oath required of judicial officers is found in Me.Const. art. IX, § 1.

15. "A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others while subject to his direction and control." Code of Judicial Conduct, Canon 3(A)(3).

16. "[D]ink . . .: PENIS—usu. considered vulgar." Webster's Third New International Dictionary (1971).

It is stipulated that with minor variations six witnesses who were present in the courtroom, including a State Police detective, two social workers, an assistant attorney general and two members of the Bar, would describe the respondent's language in similar terms. What emerges clearly is that the respondent suggested to the individual before him that he should masturbate rather than sexually abuse his children. It must be remembered that the charge of sexual abuse was merely an allegation and had not been proven.

We reject as unacceptable the suggestion that an individual's lack of education authorizes a court to deal with him differently. All persons are equal before the law. The poor and uneducated are entitled to the same treatment as the rich and learned. We also reject the contention that since the respondent was successful in keeping a family together his actions should be approved. If success or effectiveness were the criteria by which a judge's conduct is evaluated, we would see in our courts many practices which our Constitution, our history and our mores condemn as abhorrent in a system of justice under law.

We would be unrealistic if we failed to recognize that judges are merely human. The pressure occasioned by both the volume and the nature of the business which comes before the District Court may on occasion cause the best judge to use intemperate language. We must also recognize, however, that the District Court is the court with which most citizens who have judicial business come into contact. It is the District Court that projects to the mass of our citizens their image of the administration of justice. Intemperate language is on occasion understandable, but vile, obscene and abusive language is inexcusable. The law should provide an exemplar of correct behavior. When the judge presides in court, he personifies the law, he represents the sovereign administering justice and his con-

duct must be worthy of the majesty and honor of that position. Language such as the respondent used in both these cases degrades and diminishes the law, the judge and the sovereign that the judge represents.

### E.

∎ The last incident described in the report of the Committee would, standing alone, merely demonstrate a single occasion on which the respondent disregarded orderly procedure. However, in the context of the other incidents demonstrating the respondent's disregard of the law, all of which occurred within a relatively short time, this incident is another example of the respondent's administration of a personal brand of justice in disregard of the law and in violation of Canon 3(A)(1) of the Code of Judicial Conduct.[17]

On or about March 19, 1979, in the District Court in Biddeford, the respondent held a hearing and found one Robert King guilty of the charge of operating under the influence of liquor. The case was continued for sentencing on a day-to-day basis until September of 1979. At the same time, a similar charge against King was continued for hearing on the same terms. There is no authority for the kind of continuance granted by the respondent. M.D.C.Crim.R. 32(a) provides:

> Sentence shall be imposed without unreasonable delay, provided however, the court may suspend the execution thereof to a date certain or determinable. Pending sentence the court may commit the defendant or continue or alter bail.

Finding the defendant guilty and continuing the matter for a period of six months for the imposition of sentence in effect placed the defendant on informal probation to the court, a procedure unauthorized by our law.[18] That this was the respondent's

---

17. See note 10 supra.

18. Relying on pre-rules cases, the Court in State v. Fixaris, supra, 327 A.2d at 851, by way of dicta seemed to approve the procedure. Since the promulgation of our Rules of Crimi-

nal Procedure, sentence must be imposed "without unreasonable delay." M.R.Crim.P. 32(a); M.D.C.Crim.R. 32(a). Prior to May 1, 1976, a court could continue a matter for sen-

intention is apparent from his response to the Committee in which he stated:

> During the trial, it was obvious that Mr. King had other problems; i. e. drugs, etc. At that time, it was my judgment to make a finding of guilty, to continue the matter for six (6) months, and give him a chance to straighten himself out. It was my understanding that he had been admitted to some alcohol and drug rehabilitation center.

On or about September 28, 1979, the attorney for King informed the respondent that King, who was from Kansas, was not in the state and reminded the respondent that the matter had been continued to that time for sentencing. At the same time, the attorney represented to the respondent that there had been no further problem, whereupon the respondent entered findings of not guilty in both cases.

The respondent's action is inexplicable. On one charge, the respondent had already found King guilty and continued the matter for sentencing. Despite that fact he reversed himself without holding a formal hearing and entered a judgment of not guilty. On the second charge, there had been no hearing at all. The State had not been given an opportunity to prove the allegations of the complaint against the defendant; yet the respondent again entered a finding of not guilty. In the case in which the respondent had already found the defendant guilty, he could have entered a sentence of unconditional discharge. *See* 17–A M.R.S.A. § 1152(2)(B). In the case which had not been tried, the attorney for the State might have elected to file a dismissal. M.D.C.Crim.R. 48(a).

We recognize that with the volume of business in the District Court practical justice dictates simplicity of procedure. Nevertheless, under no circumstances may a desire for simplicity permit the entry of a false judgment.

F.

■ Canon 1 of the Code of Judicial Conduct provides:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

The respondent's actions in all the incidents described above, when considered together, clearly demonstrate a violation of that canon.

For all these reasons, we find that the respondent, Ralph H. Ross, has violated the following provisions of the Code of Judicial Conduct: Canon 1, Canon 2(A), Canon 2(B), Canon 3(A)(1), Canon 3(A)(3), Canon 3(A)(4) and Canon 3(C).

III.

■ The Committee has recommended to this Court that the respondent should be suspended from the performance of his judicial duties, without pay, for a period of thirty days and that he also should be relieved of any administrative responsibilities. The respondent has contended that this Court is without power or authority to impose any sanction other than a reprimand.

Under our Constitution, judicial officers other than Probate Judges are appointed by the governor subject to confirmation through the legislative process. Me.Const. art. V, pt. 1, § 8. Judicial officers may be removed during their term through joint action of the governor and the Legislature either by impeachment or address. Me. Const. art. VI, § 4; art. IX, § 5. It is thus apparent that, pursuant to our Constitution, the appointment and removal of judges is

---

tencing and place a defendant on probation. 34 M.R.S.A. § 1631 (repealed, P.L.1975, ch. 499, sec. 70). *See generally* H. Glassman, *Maine Practice, Rules of Criminal Procedure* § 32.7 (1967). The statutory procedure was recog-

nized in the rules. *See* M.R.Crim.P. 32(e); M.D.C.Crim.R. 32(e). Since the enactment of our new Criminal Code, that procedure is no longer permissible. *See* 17–A M.R.S.A. § 1201.

committed to the political departments of the government and does not involve an exercise of judicial power.

Our Constitution commits the judicial power of the State to the "Supreme Judicial Court, and such other courts as the Legislature shall from time to time establish." Me.Const. art. VI, § 1. The Supreme Judicial Court is the only court established by our Constitution. All other courts owe their existence to legislative action. As the only court established by our Constitution, it is incumbent upon the Supreme Judicial Court to exercise that part of the judicial power involved in prescribing the conduct of judges and imposing discipline upon them for misconduct. This power has been recognized legislatively. In pertinent part, 4 M.R.S.A. § 1 provides:

> The Supreme Judicial Court shall have general administrative and supervisory authority over the judicial department and shall make and promulgate rules, regulations and orders governing the administration of the judicial department.

In pertinent part, 4 M.R.S.A. § 7 provides:

> [The Supreme Judicial Court] has general superintendence of all inferior courts for the prevention and correction of errors and abuses where the law does not expressly provide a remedy . . . .

The power of the Supreme Judicial Court to create the Committee on Judicial Responsibility and Disability for the purpose of making investigations and recommendations to the Supreme Judicial Court in disciplinary matters has also been recognized legislatively. 4 M.R.S.A. § 9–B. Thus, the power of the Supreme Judicial Court to discipline judges for misconduct finds its source in the Constitution's grant of judicial power to the Court and in the legislative recognition of the power of the Supreme Judicial Court in the statutes hereinabove cited. *See, e. g., In re DeSaulnier*, 360 Mass. 787, 807–09, 279 N.E.2d 296, 307–08 (1971); *In re Mussman*, 112 N.H. 99, 101–02, 289 A.2d 403, 404–05 (1972).

Recognizing that the power of the Supreme Judicial Court to discipline does not include the power to remove a judge, the respondent argues that suspension from the performance of judicial duties is in fact and law the equivalent of removal and therefore is beyond the power of the Supreme Judicial Court. We reject that contention. By definition, suspension and removal are two separate and distinct concepts. A judge who is suspended does not thereby vacate the office; there is not a vacancy which may be filled by appointment of a new judicial officer by the political departments of the government. A suspended judge remains a judge and is merely denied the power to perform his judicial duties for a limited period of time. The power to suspend a judge has been recognized by many courts. *See, e. g., In re Troy*, 364 Mass. 15, 21–22, 300 N.E.2d 159, 163 (1973); *Ransford v. Graham*, 374 Mich. 104, 108, 131 N.W.2d 201, 203 (1964); *In re Mussman, supra; In re Franciscus*, 471 Pa. 53, 369 A.2d 1190, *cert. denied*, 434 U.S. 870, 98 S.Ct. 212, 54 L.Ed.2d 148 (1977).

Article VI, Section 2 of our Constitution provides:

> The justices of the Supreme Judicial Court and the judges of other courts shall, at stated times receive a compensation, which shall not be diminished during their continuance in office, but they shall receive no other fee or reward for their services as justices or judges.

Relying upon this constitutional provision, the respondent argues that, even if this Court has the power to suspend a judge, it may not suspend him without pay. We have no occasion to address that issue and intimate no opinion upon it since in this case we do not deem it appropriate to suspend the respondent without pay.

■ The purpose of sanctions in cases of judicial discipline, as in cases of lawyer discipline, is not vengeance or retribution. Those concepts have no place in a disciplinary system designed to assure the orderly administration of justice in the public interest. Any sanction must be designed to preserve the integrity and independence of the judiciary and to restore and reaffirm the public confidence in the administration of justice. Any sanction must be designed to

announce publicly our recognition that there has been misconduct; it must be sufficient to deter the individual being sanctioned from again engaging in such conduct and to prevent others from engaging in similar misconduct in the future. Thus, we discipline a judge to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned. We discipline a judge to reassure the public that the judiciary of this state is dedicated to the principle that ours is a government of laws and not of men.

■ Although we have found several instances of misconduct by the respondent violative of the Code of Judicial Conduct, there is not the slightest hint that his improper conduct was motivated by personal gain or benefit. Pending final decision in this matter, the respondent was temporarily suspended on the date the report of the Committee was filed with this Court. He has remained unable to perform his full judicial duties during the pendency of this proceeding. This decision will publicly announce his misconduct. Under such circumstances and in light of the nature of the misconduct of the respondent, we deem a suspension from the performance of judicial duties for a period of ninety days effective January 26, 1981, the date of the order of temporary suspension, to be an appropriate sanction. Any lesser sanction would minimize the seriousness of the misconduct involved; any greater sanction would be unjustly vindictive.

It is unnecessary for us to address the issue raised by the Committee's recommendation that the respondent be relieved of any administrative responsibility. The administration of the District Court is now in the hands of the newly appointed Chief Judge and Deputy Chief Judge.

It is ADJUDGED that Ralph H. Ross has violated Canons 1, 2(A), 2(B), 3(A)(1), 3(A)(3), 3(A)(4) and 3(C) of the Code of Judicial Conduct.

It is ORDERED that Ralph H. Ross be, and he is hereby, suspended from the performance of his duties as a Judge-at-large of the District Court for a period of ninety days, effective January 26, 1981.

All concurring.