MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2016 ME 116
Docket:      Jud-14-1
Argued:      November 4, 2015
Decided:     July 21, 2016

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.


IN THE MATTER OF ROBERT M.A. NADEAU


PER CURIAM

[¶1]  The Committee on Judicial Responsibility and Disability has filed a report with the Supreme Judicial Court against Probate Judge Robert M.A. Nadeau, alleging several violations of the Maine Code of Judicial Conduct[1] based on statements he made in a letter to counsel regarding a court proceeding in which he was a party, and based on his judge-related Internet and social media activity. The Committee has also recommended that we impose sanctions against Judge Nadeau as a result of the alleged violations.

[¶2]  A de novo evidentiary hearing was held before a Hearing Justice (*Clifford, J.*) designated by the Court. Based on the findings of the Hearing Justice, which are properly supported by the record, we conclude that Judge Nadeau committed one actionable violation of the Code based on statements

_____

[1] The version of the Maine Code of Judicial Conduct applicable to this proceeding was promulgated in 1993 and became effective that year. *See* M. Code Jud. Conduct II(2) (Tower 2013). The Code has since been superseded by a revised version, effective September 1, 2015. M. Code Jud. Conduct II. In this decision, our discussion is of the Canons from the 1993 Code, and our citations to and quotations of them draw on that version of the Code.

2

he made in the letter to counsel. Further, because of the seriousness of this violation, we impose a public censure and reprimand, and a thirty-day suspension from the performance of his duties as judge of the York County Probate Court.

## I. PROCEDURAL BACKGROUND

[¶3] In matters of judicial discipline, "[t]the Supreme Judicial Court has exclusive original jurisdiction." *In re Nadeau*, 2007 ME 21, ¶ 10, 914 A.2d 714 (quotation marks omitted). Invoking that authority, in October 2014 the Committee filed with the Supreme Judicial Court a five-count report against Judge Nadeau. *See* M.R. Comm. Jud. Responsibility & Disability 3 (Tower 2013).[2] In a procedural order, the Chief Justice, acting for the Court, appointed an Active Retired Justice of the Court to preside as Hearing Justice and conduct a de novo hearing at which the Committee and Judge Nadeau could present evidence on the allegations. *See In re Ross*, 428 A.2d 858, 860 (Me. 1981). The procedural order specified that the Hearing Justice's findings were to be treated as those of a referee pursuant to M.R. Civ. P. 53(e)(2).

[¶4] After holding a hearing in February 2015, the Hearing Justice issued several orders containing findings of fact, which we adopt because they are supported by the record, *see In re Nadeau*, 2007 ME 21, ¶ 10, 914 A.2d 714, and in

---

[2] We cite to the Maine Rules of the Committee on Judicial Responsibility and Disability that were in effect at the time of the alleged violations. Portions of the Rules have been amended since the administrative proceeding that led to the Committee's report to the Court.

any event are not in material dispute. In the orders, the Hearing Justice concluded that the Committee had established four of the five alleged violations.[3] Pursuant to a subsequent procedural order issued by the Court, the parties filed further arguments on the merits of the Committee's charges and on the issue of what sanctions, if any, should be imposed were we to determine that Judge Nadeau's conduct violated the Code.

[¶5] Based on the findings rendered by the Hearing Justice sitting as a referee, we proceed to determine, on a de novo basis, whether Judge Nadeau violated the Code. *See id.* ¶ 5. In doing so, we give no deference to the Committee's report, *see id.* ¶ 10, even though the Committee is charged with deciding administratively whether a charge "has been established," M.R. Comm. Jud. Responsibility & Disability 2(I) (Tower 2013). "The Committee bears the burden of proving the allegations contained in its report." *In re Nadeau*, 2007 ME 21, ¶ 10, 914 A.2d 714.

## II. VIOLATIONS ALLEGED BY THE COMMITTEE

[¶6] Judge Nadeau is the York County Probate Judge, which, like all Probate Court judicial offices in Maine, is an elected office. Judge Nadeau held that judicial office from 1996 to 2008, when he was defeated in a primary election, and again from his re-election in 2012 to the present. The office of probate judge

---

[3] The Committee no longer pursues the violation alleged in the fifth count. *See infra* n.6.

is a part-time position, and at all times pertinent to this case Judge Nadeau has maintained a private law practice as he is permitted to do. The allegations contained in the Committee's report highlight the tension that can emerge between the ethical responsibilities that arise from holding judicial office and a judge's extra-judicial activities.

[¶7] After a brief discussion of the principles and application of the Code, we consider the two counts that are based on statements that Judge Nadeau wrote in a letter to an attorney who represented the adverse party in a case where Judge Nadeau was an unrepresented party. We then turn to the two remaining counts, which are based on a website and a Facebook page that Judge Nadeau created through a media consultant.

A. Code of Judicial Conduct

[¶8] The delivery of justice and public confidence in the integrity of the judiciary necessarily rests on judicial officers' adherence to the ethical standards prescribed in the Code. As is true with the current Canons, *see* M. Code Jud. Conduct preamble, the Canons in the 1993 Code, which governs this proceeding, were designed to ensure that judges act in a way that is fitting of judicial office and fulfills their crucial responsibility to protect the "public trust" of a system that is founded on the rule of law, *see* M. Code Jud. Conduct preamble (Tower 2013). In this way, members of the public can be justified in having

confidence in and respect for both the institution of the judiciary as a whole and the proper adjudication of specific disputes.

[¶9] As the Preamble to the 1993 Code made clear, the Canons provided "rules of reason."

> It is not intended . . . that every transgression will result in disciplinary action. Whether disciplinary action is appropriate, and the degree of discipline to be imposed, should be determined through a reasonable and reasoned application of the Code and should depend on such factors as the seriousness of the transgression, whether there is a pattern of improper activity, and the effect of the improper activity upon others or upon the judicial system.

*Id.* Therefore, the application of the Canons requires sensitivity to the extraordinarily important objectives they served, viewed in the particularized "circumstances and conditions in which judges must operate." Advisory Committee's Notes to 1993 promulgation of former M. Code Jud. Conduct at 6 (effective Sept. 1, 1993) (hereinafter, "Advisory Notes").

[¶10] Although Judge Nadeau was not acting in an immediate judicial capacity when he engaged in the conduct at issue in this proceeding, his conduct remained subject to the standards created in the Code. Canon 4 of the 1993 Code was devoted expressly and entirely to a judge's conduct outside of the judicial realm, covering activities that are avocational, governmental, civic, charitable, financial, fiduciary, and professional. *See* M. Code Jud. Conduct I(4)

6

(Tower 2013).[4]  The Code's reach beyond the bench to conduct such as that at issue here was necessary because judges are the face of the judiciary, and their extra-judicial conduct and activities—like their conduct in the judicial role—reflect on the court system.  As is stated in a leading treatise on judicial ethics,

> Judges are held to higher standards of integrity and ethical conduct than attorneys or other persons not invested with the public trust.  This heightened standard of conduct extends beyond the limits of the judge's court, for "a judge's duty does not stop at the robing room door."  Even in a judge's personal life, he or she must adhere to standards of probity and propriety far higher than those deemed acceptable for others.

Charles Gardner Geyh et al., *Judicial Conduct and Ethics* § 1.02 at 1-4 (5th ed. 2013) (alteration omitted) (citation omitted).  This important observation explains why a judge's conduct, even outside of the direct exercise of judicial responsibilities, remains subject to the ethical constraints created by the Code.  *See In re Cox*, 658 A.2d 1056, 1058 (Me. 1995) (applying the Code to a judge's conduct in a personal real estate transaction).  Therefore, we must consider the impact of the Canons on Judge Nadeau's conduct with an eye toward the critical

---

[4]  The scope of restrictions on extra-judicial activities differed somewhat as between Probate Court judges, who are part-time, and state court judges, who are full-time.  *See* M. Code Jud. Conduct II(1)(B) (Tower 2013).  For example, a judge of probate was not subject to the prohibition applicable to other judges against engaging in the practice of law.  *See* M. Code Jud. Conduct II(1)(B)(1)(b) (Tower 2013); M. Code Jud. Conduct I(4)(G) (Tower 2013).  Nonetheless, all judges—whether full-time or part-time—engage in activities outside of the scope of their judicial duties, and all were permitted to appear as unrepresented litigants, just as Judge Nadeau did in the court action at issue here.  *See* M. Code Jud. Conduct I(4)(G) (Tower 2013).  The Code that was adopted in 2015, *see supra* n.1, contains comparable provisions.  *See, e.g.*, M. Code Jud. Conduct I(B)(2), Canon 3, R. 3.10.

justification for applying the Canons to extra-judicial activities: promoting and maintaining public confidence in the integrity of the judiciary.

[¶11]  With these underlying principles in mind, we consider the four counts of the report that the Committee presses.[5]

B.    Letter to Counsel

[¶12]  Two of the counts in the Committee's report are based on different portions of a letter that Judge Nadeau sent to an attorney who practices in a firm located in York County.

1.    Comments Directed to Counsel (Count 3)

[¶13]  In 2013, while a judge but in his personal capacity, Judge Nadeau commenced an action in the Maine District Court for protection from harassment against his former girlfriend, who lived in Massachusetts.  Judge Nadeau was not represented by counsel in that proceeding, but an attorney represented his former girlfriend.  In his complaint for protection from harassment, Judge Nadeau alleged that the former girlfriend improperly disclosed confidential or otherwise private medical and other information about him.   While the case was pending, Judge Nadeau wrote a letter to the former girlfriend's attorney of record, stating,

> You know that, putting aside your training and evident desire to simply argue and advocate, you need to advise your client to pull her book and internet advertising immediately, at a minimum, under the

---

[5]  In doing so, we deviate from the sequence of the counts set out in the Committee's report.

8

circumstances. This is a matter of, at the minimum, clearly protected medical privacy. The consequences of not doing so can be devastating, not only for her and her best friend, but probably even for you, and their former or current [Massachusetts] lawyer. . . . You can posture all you want in the interest of advocacy. But absent immediate, legitimate responsibility and cooperation designed to achieve amicable, nonmonetary resolution of whatever issues your client and I apparently have, *I respectfully submit this is going to become very bad for your client, you and your law firm*.

(Emphasis added.) Judge Nadeau's letter also included the following statement in a footnote:

I am incidentally in possession of a hard copy of an email from [an attorney] of your firm to [York County Probate] Register Lovejoy in which [the attorney] snidely referred to me as "his eminence." If that was not meant to be pejorative or disrespectful of me *as a jurist* and an ethical violation, I request [the attorney's] full explanation within 10 days from the date of this letter.

(Emphasis added.)[6]

[¶14] In Count 3 of its report, the Committee alleges that these comments violated Canon 1 because they compromised the integrity of the judiciary,[7] and

---

[6] This footnote also formed the basis for the fifth count of the Committee's report to the Court, in which the Committee alleged that in the footnote, Judge Nadeau disclosed nonpublic information that he had acquired in his judicial capacity in violation of Canon 3(B)(11). The Hearing Justice found that when Judge Nadeau sent the letter to the former girlfriend's attorney, the contents of the email sent to the Register of Probate were in a record that was already public and that Judge Nadeau's republication of it therefore did not violate the Code. The Committee no longer presses this count.

[7] Canon 1 read in full:

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective.

Canon 2(B)[8] because the comments advanced his personal interests. We conclude that with the written statements directed to counsel, Judge Nadeau violated those provisions of the Code.[9]

[¶15] In the letter, Judge Nadeau aggressively explained to the former girlfriend's attorney the difficulties that would arise if the parties' dispute were not resolved. The stated difficulties included extended discovery and disclosure by Judge Nadeau of information that, he implied, would not be favorable to the former girlfriend. As the Hearing Justice observed, Judge Nadeau's warning to the former girlfriend's attorney that continued litigation would be "very bad" for the attorney and his firm was in a statement connected to the proceeding that was the subject of the letter and perhaps not improper by itself. In the footnote, however,

---

M. Code Jud. Conduct I(1) (Tower 2013).

[8] Canon 2(B) provided in pertinent part: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge . . . ." M. Code Jud. Conduct I(2)(B) (Tower 2013).

[9] The Committee's report also included an allegation that the statement in the footnote violated Canon 4(A)(1) (Tower 2013), which required a judge to conduct extra-judicial activities in a way that does not "cast reasonable doubt on the judge's capacity to act impartially as a judge," because the statement implicated Judge Nadeau's impartiality in cases involving the lawyers in the firm that represented his former girlfriend. The Hearing Justice concluded, however, that Judge Nadeau had not violated Canon 4(A)(1) because Judge Nadeau recuses himself from all Probate Court matters where any of the attorneys in the law firm that represented the former girlfriend appeared as counsel, and thus that there would not be a perception of bias against lawyers in that firm or their clients. We independently agree with that conclusion.

The Hearing Justice concluded that Judge Nadeau's statements in the footnote violated Canon 4(A)(2) (Tower 2013), which prohibited judges from engaging in extra-judicial conduct that "demean[s] the judicial office." The Committee did not allege a violation of Canon 4(A)(2), however, and so we do not address it.

Judge Nadeau interposed his judicial position into his presentation by recounting a "snide[]" email from another member of the attorney's firm, containing a negative reference to Judge Nadeau in his judicial capacity. Judge Nadeau then "request[ed] . . . [a] full explanation within 10 days" if the email was not intended to be "pejorative or disrespectful."

[¶16] Judge Nadeau violated the Code when, in the admonition, he explicitly injected his judicial office into a situation that was entirely unrelated to that position–indeed, he himself wrote that the point was "incidental[]." The evident purpose of the letter was to persuade the former girlfriend's attorney of the benefits of settling the private dispute that was then in litigation. Judge Nadeau's position as a judge had no legitimate bearing on that dispute. As the Hearing Justice found, Judge Nadeau "inappropriately and inexplicably" referred to his judicial position, and he did so in the context of a warning that ongoing litigation would be "very bad" for the attorney representing the former girlfriend and for that attorney's firm, with which the attorney who had sent the email to the Register of Probate was affiliated.

[¶17] Judge Nadeau's statements in the letter had several combined effects. He exploited his judicial office for personal gain because he gratuitously invoked his position of judicial and public prominence to advance his personal objective of settling the protection case on his terms.

[¶18]   At the same time, because Judge Nadeau's judicial authority had nothing to do with the matter at hand, the statements in the letter conveyed a threatening tone.   On the heels of his statement that the protection case would develop in a way that would be "very bad" for the attorney and others in the attorney's firm, Judge Nadeau sought a "full explanation" why another attorney in the firm referred to Judge Nadeau as "his eminence" if that reference was not intended to be "pejorative or disrespectful."   Although Judge Nadeau framed this as a "request," he connected it directly to his judicial office and presented it coercively, even making it subject to a ten-day deadline.   As Judge Nadeau presented the "request," it would leave the attorney who wrote the email in a position where if he did not contact Judge Nadeau within ten days, presumably with an apology, he would be impliedly admitting that his email was "pejorative or disrespectful of [him] as a jurist."

[¶19]   Judge Nadeau's statements diminished the integrity of the judiciary, and invoked the power and prestige of his office without justification and for his own purposes.   He therefore violated Canons 1 and 2(B).

[¶20]   Judge Nadeau argues that even if his conduct amounted to violations of the Code, it is protected by the First Amendment.[10]   The United States Supreme

---

[10]   In an earlier case, we did not reach the question of whether, when allegations of judicial misconduct had First Amendment implications, the Committee was required to prove its allegations by a preponderance of the evidence, or by clear and convincing evidence.  *See In re Nadeau*, 2007 ME 21,

12

Court has recently addressed the relationship between a judge's constitutional right to free speech and restrictions on a judge's speech imposed by codes of judicial ethics. *See Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1672-73 (2015) (holding that a prohibition against a personal solicitation of campaign funds by a candidate seeking election to become a judge did not violate the candidate's First Amendment rights).

[¶21] In *Williams-Yulee*, the Supreme Court first held that restrictions on a judicial candidate's speech are subject to strict scrutiny—that is, that they must be narrowly tailored to serve a compelling interest. *Id*. at 1665. As the Court observed, the state has a "compelling interest in preserving public confidence in the integrity of the judiciary," *id.* at 1666, and the "public perception of judicial integrity is a state interest of the highest order," *id.* (quotation marks omitted); *cf. In re Nadeau*, 2007 ME 21, ¶ 17, 914 A.2d 714 (stating that public confidence in a fair judiciary "undoubtedly is a compelling state interest"). Canons 1 and 2(B) of the Maine Code of Judicial Conduct directly promoted this compelling interest and therefore met this element of the strict scrutiny standard.

[¶22] Then, addressing the scope of a constitutional restriction on speech, the Supreme Court held that the regulation must be narrowly tailored but need not

---

¶ 15, 914 A.2d 714. We again need not and do not reach that issue, because the parties do not dispute the facts, and so the difference between the standards of proof is not consequential in this proceeding.

be "perfectly" so, *Williams-Yulee*, 135 S. Ct. at 1671 (quotation marks omitted): "[t]he impossibility of perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence in the integrity of the judiciary." *Id*. Here, Canons 1 and 2(B) were narrowly tailored to regulate a judge's conduct because, by their terms, they applied only to conduct that impugned the integrity of the judiciary and diminished confidence in the justice system. Seen objectively, Judge Nadeau's statements invoked his status as a judge for personal gain. Judge Nadeau's statements therefore negatively implicated the integrity of the judiciary and fell within the narrow scope of conduct prohibited by the Canons.

[¶23] This conclusion also resolves Judge Nadeau's related argument that when these Canons are applied to speech, they are overbroad and therefore unconstitutional. Because Canons 1 and 2(B) survive a strict scrutiny analysis and are not facially unconstitutional, they are overbroad only if they "sweep[] within [their] ambit a *substantial* amount of protected speech." *State v. Events Int'l, Inc.*, 528 A.2d 458, 461 (Me. 1987). That is not the case here. By requiring judges to observe standards that preserve the integrity of the judiciary and barring judges from lending the prestige of their office to advance their private interests, Canons 1 and 2(B) defined the scope of conduct that they governed. If a judge's speech fell

14

outside of the scope of the Canons, then the Canons did not apply in the first place, and so their application was not overbroad.

[¶24]  We therefore conclude that the Committee has proved that Judge Nadeau violated Canons 1 and 2(B) as alleged in Count 3 and that the Canons did not violate his First Amendment rights.

2.     Criticism of Another Judge (Count 4)

[¶25]  In the same letter, Judge Nadeau made statements about a District Court judge who had presided in the protection from harassment case and granted the former girlfriend's motion to dismiss Judge Nadeau's complaint.  In his letter, Judge Nadeau disparaged an assertion contained in a pleading filed by the attorney in the protection from harassment case, where the attorney alleged that his client (the former girlfriend) had been "maligned."  In his letter, Judge Nadeau wrote that the presiding District Court judge who accepted that argument was "very female-biased and unknowing."

[¶26]  The Committee asserts that this statement was a categorical criticism of a judge made by another judge in violation of the Code, because the statement undermined the integrity of the judiciary in violation of Canon 1, *see supra* n.7; did

not promote public confidence in the judiciary, in violation of Canon 2(A)[11]; and demeaned the judicial office in violation of Canon 4(A)(2).[12]

[¶27] We conclude that the Code cannot support a finding of misconduct for a judge's nonpublic statements that were critical—whether unfairly or not—of another judge, when the statements were made in the context of a case where the declarant judge was a litigant.

[¶28] Although the Committee relies on general canonical standards in support of the charge alleged in Count 4, we must consider Canon 3(B)(9), which addressed when a judge may comment publicly on a pending court proceeding. That Canon provided in pertinent part:

> A judge shall abstain from public comment about a pending or impending proceeding in any court . . . . This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court. *This subsection does not apply to proceedings in which the judge is a litigant in a personal capacity.*

M. Code Jud. Conduct I(3)(B)(9) (Tower 2013) (emphasis added).

[¶29] Judge Nadeau framed his comment about the disposition of the protection from harassment case by referring to the presiding District Court judge.

---

[11] Canon 2(A) provided in full: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." M. Code Jud. Conduct I(2)(A) (Tower 2013).

[12] Canon 4(A)(2) provided: "A judge shall conduct all of the judge's extra-judicial activities so that they do not . . . demean the judicial office." M. Code Jud. Conduct I(4)(A)(2) (Tower 2013).

16

In effect, however, Judge Nadeau's comment was a statement about the case itself because it was about a decision made by a judge in a case where he was a litigant in a personal capacity. The statement therefore falls outside of the proscription otherwise created by Canon 3(B)(9).

[¶30] The inquiry does not end there, however, because one Canon's failure to reach certain conduct did not necessarily create a safe harbor if that conduct was prohibited elsewhere in the Code. Although the language of Canon 3(B)(9) simply purported to exclude from its application statements about cases in which the judge appeared personally, the Advisory Committee's Note expressly states that the Canon was intended to "*permit*[]" a judge to make comments about such cases. Advisory Notes at 29 (emphasis added). That is what Judge Nadeau did here, and so irrespective of the effect of other Canons, his comment cannot be seen as a violation of the Code.

[¶31] Further, Canon 3(B)(9) barred a judge from making *public* comments about pending or impending cases. Judge Nadeau's statement about the District Court judge was nonpublic, as he made it in a private letter sent to the adverse party's attorney. The Advisory Committee's Note explains that Canon 3(B)(9) did not extend to nonpublic statements because of concerns that if that provision encompassed private speech, it "would set an unduly broad and

vague standard." *Id*.[13] Although Judge Nadeau argues that his criticism of the judge was protected as free speech, we need not reach the merits of his argument or the Advisory Committee's own concern about the constitutionality of a prohibition against a judge's nonpublic comments concerning a pending case. For purposes of this proceeding, it is sufficient to state that because of an apprehension of that problem, the Canons themselves were intended to stop short of regulating nonpublic speech such as Judge Nadeau's.

[¶32] Accordingly, we conclude that because Judge Nadeau's disparaging comment about another Maine judge was not public and concerned a case in which he was a litigant, it was not prohibited by the Code. We acknowledge, however, the concerns underlying the Committee's argument. One judge's published assertion that another judge is biased, particularly when the declarant judge has had direct dealings with the criticized judge, could well compromise confidence in the criticizing judge or the criticized judge and therefore in the judiciary as a whole.[14] Our responsibility, however, is to gauge Judge Nadeau's conduct against the

---

[13] The Advisory Committee's note explains that an absolute bar on *public* statements was justified because of "[t]he difficulty of assessing the impact of public comment on an unknown audience." Advisory Committee's Notes to 1993 promulgation of former M. Code Jud. Conduct at 29 (effective Sept. 1, 1993).

[14] It is unclear to us if by describing the District Court judge as "unknowing," Judge Nadeau was describing his views of the intellect of the other judge, or whether he was stating that the criticized judge did not realize that he was "very female-biased." If the former, it would make Judge Nadeau's criticism even more troubling but would not lead to a different result in this disciplinary proceeding.

18

requirements of the Code, and we must conclude that in this instance he did not violate it.

C.      Social Media and Internet Activity

[¶33]  Two of the charges filed by the Committee are based on information that Judge Nadeau posted on the Internet—specifically, a website and a Facebook page—in association with his 2012 election campaign.  We address those allegations in turn.

1.      Link to Website of Judge Nadeau's Law Office (Count 1)

[¶34]  After Judge Nadeau was re-elected to judicial office in 2012, a marketing and media consultant retained by Judge Nadeau either created a new website or modified an existing one so that it was entitled, "York County Probate Judge Robert Nadeau."  That website, which showed Judge Nadeau wearing a judicial robe, was his personal website and not an official website of the York County Probate Court.  It also provided a link to the website of his private law office.  By using that link, a person who viewed Judge Nadeau's personal judicial website could then move directly to the website for Judge Nadeau's private law office.  In Count 1 of its report, the Committee alleges that Judge Nadeau violated Canon 2(B), *see supra* n.8, by using the judicial office for personal gain.[15]

---

[15]  The Committee is not alleging that a judge would have violated the Canons merely by maintaining a judicial website.

[¶35]  Count 1 of the Committee's complaint raises questions regarding the uses of ubiquitous forms of technology by judges who are allowed by statute to maintain a private practice, *see* 4 M.R.S. § 307 (2015); *see also Estate of McCormick*, 2001 ME 24, ¶ 16, 765 A.2d 552 ("The Maine Legislature . . . has continued to allow probate judges to maintain active probate practices.").  Bearing in mind the principle that matters of judicial discipline were subject to rules of reason, M. Code Jud. Conduct preamble (Tower 2013), we conclude that under the unique circumstances of this case, Judge Nadeau did not engage in conduct that warrants a formal determination that he violated Canon 2(B).  Although the creation of a direct electronic pathway from a judicial website to a law office website might be seen to lend the prestige of judicial office to advance personal interests and therefore implicate Canon 2(B), there are several considerations that diminish the need for disciplinary action.

[¶36]  As the Hearing Justice found, Judge Nadeau provided the link to the website of his private law office on the judicial website for the purposes of eliminating confusion within the general public and preventing instances where a person who wanted to contact him in his capacity as a lawyer mistakenly contacted the Probate Court.  The link did not actually generate any business for Judge Nadeau's law office.  Further, Judge Nadeau promptly removed the link to his private law office as soon as a complaint was made, effectively resolving the

Committee's concerns about the issue. In this matter of first impression, these circumstances weigh against a formal finding of judicial misconduct.

[¶37] Notwithstanding this determination, the Committee's report serves the important purpose of underscoring the ethical problems that arise when it is alleged that a judge has used the judicial office as a platform for personal and other nonjudicial activities. When a part-time judge, acting in a judicial capacity, establishes a pathway on a judicial website for a user to contact the judge with the prospect of a remunerative benefit to the judge, the judge *may* create the perception of using the judicial office held in public trust as a means to create a private, commercial advantage. Any such conduct by a judge must be preceded by a careful and sensitive consideration of the requirements of the Canons and the critically important goals they are designed to achieve.

2.  Facebook Page (Count 2)

[¶38] During the 2012 election campaign when he sought election as probate judge, Judge Nadeau, through the same media consultant, created a Facebook page, which recited that it was the "[o]fficial page of York County Judge of Probate Robert Nadeau." Judge Nadeau continued to maintain the Facebook page after he was reelected. In fact, it was not the "official" page of the York County Probate Court. On the page, Judge Nadeau posted photographs of the York County Courthouse as well as several photographs of himself wearing

judicial robes, in military uniform, and with his family. It also includes posts to and from supporters.

[¶39] In Count 2 of its report to the Court, the Committee alleges that because Judge Nadeau was responsible for the creation of a Facebook page that was falsely described as his "[o]fficial" judicial page, he violated Canon 2(A), *see supra* n.11, which required a judge to "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," M. Code Jud. Conduct I(2)(A) (Tower 2013); and Canon 4(A)(2), *see supra* n.12, which prohibited a judge from engaging in extra-judicial conduct that "demean[s] the judicial office," M. Code Jud. Conduct I(4)(A)(2) (Tower 2013). The Committee's allegation in Count 2 is based on the description of the Facebook page as the Probate Court's official page, and not on the contents of the comments that Judge Nadeau posted on it.

[¶40] Canon 2 was designed to "maintain[] public confidence in the judiciary by avoiding impropriety and the appearance of impropriety in all of [the judge's] activities, both professional and personal." Advisory Notes at 11. Improprieties proscribed by Canon 2(A) consisted both of violations of positive law found in statute, rules, and the Code; and other conduct that was "irresponsible and improper" although not specifically barred by particular authority. *Id.*

22

(quotation marks omitted). The Committee has not proved that Judge Nadeau's conduct violated either aspect of Canon 2(A).

[¶41]   First, the Committee argues that Judge Nadeau's Facebook page demeaned the judicial office in violation of Canon 4(A)(2) and therefore derivatively violates Canon 2(A). Conduct that "demeans the judicial office" within the meaning of Canon 4(A)(2) "connotes injurious conduct, not merely undignified conduct, as the latter might in some cases not be proscribed." Advisory Notes at 45 (quotation marks omitted). There is no dispute that Judge Nadeau was, in fact, the duly elected judge of probate for York County. The Committee has not proved that a reader's possible impression that Judge Nadeau's Facebook page was the Probate Court's official page would result in injury to the Court. Therefore, Judge Nadeau's mischaracterization of his Facebook page does not constitute a proven violation of Canon 4(A)(2), which means that it was also not a violation of Canon 2(A) based on conduct that was prohibited by Canon 4(A)(2).

[¶42]   Second, the Committee has not proved more generally that the Facebook page was "irresponsible and improper" within the meaning of Canon 2(A), as that meaning is explained in the Advisory Committee's Note, Advisory Notes at 11 (quotation marks omitted). Regardless of whether Judge Nadeau exercised good judgment when he held out his Facebook page as the

official presentation of the court that he served, the salient question is whether that decision rose to the level of an ethical breach pursuant to the Code, particularly when its provisions are treated as "rules of reason." M. Code Jud. Conduct preamble (Tower 2013). The Committee has not proved that the ambiguous description of the Facebook page compromised public confidence in the York County Probate Court or some other court, or that it created a perception of impropriety.

[¶43] We therefore conclude that based on the limited scope of the allegations in Count 2, the Committee has not proved that Judge Nadeau's Facebook page amounted to a violation of the Code.

## III. SANCTIONS

[¶44] Having determined that Judge Nadeau violated the Code in his letter to counsel as charged in Count 3, we turn to the question of what sanctions, if any, should be imposed.

[¶45] In determining an appropriate sanction, we are guided by the Preamble to the Code:

> Whether disciplinary action is appropriate, and the degree of discipline to be imposed, should be determined through a reasonable and reasoned application of the Code and should depend on such factors as the seriousness of the transgression, whether there is a pattern of improper activity, and the effect of the improper activity upon others or upon the judicial system.

M. Code Jud. Conduct preamble (Tower 2013); *see also In re Nadeau*, 2007 ME 35, ¶ 2, 916 A.2d 200. Any sanction we impose "must be designed to preserve the integrity and independence of the judiciary and to restore and reaffirm the public confidence in the administration of justice." *In re Ross*, 428 A.2d at 868. Similarly, any sanction "must be sufficient to deter the individual being sanctioned from again engaging in such conduct and to prevent others from engaging in similar misconduct in the future." *Id.* at 869.

[¶46] The conduct underlying Count 3 is a serious violation of the Code because it consists of leveraging judicial prestige for personal benefit and attempting to induce others to act by improperly invoking judicial authority. Judge Nadeau argues that the violation did not result in actual prejudice because he recuses himself from any Probate Court proceeding that involves the lawyer to whom he sent the letter and other lawyers in that firm. This argument, however, overlooks the inherent harm that is created when a judge inappropriately invokes the judicial office in an effort to accomplish a goal unrelated to that position, and makes statements that, because of the judge's authority, appear to be threatening.

[¶47] Other factors weigh in favor of a sanction of substance. Although the material facts in this proceeding are not in dispute, Judge Nadeau has vigorously denied that any of his conduct violated his ethical responsibilities as a judge, as prescribed in the Code. As we found in a prior case involving this same judge,

"[h]is refusal to acknowledge that he acted wrongfully and violated the Code adds to the seriousness of the transgression." *In re Nadeau*, 2007 ME 35, ¶ 3, 916 A.2d 200.

[¶48] Further, this is now the third time that Judge Nadeau has been found to have violated professional ethical standards. In Judge Nadeau's capacity as a lawyer, a Single Justice of this Court determined that he violated the Maine Bar Rules by making "discourteous and degrading" statements to a judge. *Bd. of Overseers of the Bar v. Nadeau*, BAR-05-03 (March 2, 2006) (Alexander, J.). The Justice publicly reprimanded Judge Nadeau and ordered him "to conduct himself in the future so as to avoid further occasions of professional misconduct." *Id.* Then, in a judicial disciplinary proceeding, we found that Judge Nadeau violated the Code of Judicial Conduct by lying about an electoral opponent during a campaign for judicial office. *See In re Nadeau*, 2007 ME 21, ¶¶ 2, 18-19, 26, 914 A.2d 714. As sanctions in that case, we imposed a public censure and reprimand, and a partially probated thirty-day suspension from judicial duties, with the requirement that Judge Nadeau attend an educational program on judicial ethics and cooperate with the Maine Assistance Program to address his depression (an issue he has not raised here in mitigation or otherwise). *In re Nadeau*, 2007 ME 35, ¶ 7, 916 A.2d 200.

26

[¶49]  The dispositions imposed in those two cases—ranging from training on judicial ethics to public reprimands and a suspension from the bench—were designed to provide Judge Nadeau with the tools and incentive he appears to require to conduct himself in an ethically responsible manner.  Our determination here that Judge Nadeau has again violated the Code demonstrates that the prior corrective efforts have not been effective in dissuading him from engaging in intemperate conduct prohibited by the Canons.

[¶50]  We impose a public censure and reprimand for the ethical violation established in this proceeding.  Additionally, because Judge Nadeau has again committed a substantial and actionable violation of the Code, we suspend Judge Nadeau from the office of judge of probate—as we did before—for a period of thirty calendar days, but without suspending any portion of that period of suspension.[16]

---

[16]  We decline to impose a forfeiture to York County as requested by the Committee to cover the expenses of a substitute judge, because it appears that a suspension will automatically result in the loss of compensation to Judge Nadeau.

The entry is:

> It is ordered that Judge Nadeau be, and hereby is, censured and reprimanded for violations of Canons 1 and 2(B) of the 1993 Maine Code of Judicial Conduct as alleged in Count 3 of the Report of the Committee on Judicial Responsibility and Disability. It is further ordered that Judge Nadeau is suspended from the performance of his duties as a judge of the York County Probate Court for a period of thirty days commencing October 3, 2016.

_____

**Counsel on the filings and at oral argument:**

Cabanne Howard, Esq., Committee on Judicial Responsibility and Disability, Portland, for the Committee on Judicial Responsibility and Disability

Stephen B. Wade, Esq., Skelton, Taintor & Abbott, Auburn, for Robert M.A. Nadeau