MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2017 ME 121
Docket:       Jud-16-1
Argued:       February 10, 2017
Docket:       Jud-17-1
Submitted
  On Briefs:  May 22, 2017
Decided:      June 20, 2017

Panel:        SAUFLEY C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

## IN THE MATTER OF ROBERT M.A. NADEAU

PER CURIAM

[¶1]  The Committee on Judicial Responsibility and Disability filed two reports with us—in our capacity as the Supreme Judicial Court—alleging a total of six violations of the Maine Code of Judicial Conduct by then York County Probate Judge Robert M.A. Nadeau and recommending sanctions.

[¶2]  A report, filed January 19, 2016, docket number Jud-16-1, alleged five violations of the Maine Code of Judicial Conduct arising from Judge Nadeau's actions while a judge-elect or a sitting judge.[1]  A second report, filed

---

[1]  Regarding the matters at issue in Jud-16-1, Robert M.A. Nadeau was judge-elect or the sitting York County Probate Judge at the time of all of his judicial actions addressed in this proceeding and at the time of all matters considered by the Committee on Judicial Responsibility and Disability and by the Hearing Justice appointed by this Court.  He was not reelected in the November 2016 election and ceased to hold office January 1, 2017.  *See* Me. Const. art. VI, § 6.  The February hearing before this Court in Jud-16-1 occurred after he left office.  For purposes of this opinion, however, Robert Nadeau will be referred to as "Judge Nadeau" because he held judicial office at the time the conduct at issue occurred.

2

March 16, 2017, docket number Jud-17-1, alleged one violation of the Maine Code of Judicial Conduct arising from allegations that Judge Nadeau used his law firm web page to solicit donations to support his campaign for reelection as York County Probate Judge.  Because the two reports from the Committee were filed at different times and were considered through different procedures by the Committee and this Court, the ethical violations addressed in each report will be addressed separately in this opinion.

## I.  CASE HISTORY[2]

### A.    Jud-16-1 Proceedings

[¶3]  "[T]he Supreme Judicial Court has exclusive original jurisdiction" in matters of judicial discipline.  *In re Nadeau*, 2007 ME 21, ¶ 10, 914 A.2d 714. Invoking that authority, on January 19, 2016, the Committee filed a report alleging that Judge Nadeau committed five violations of the Maine Code of Judicial Conduct.[3]  *See* M.R. Comm. Jud. Responsibility & Disability 3.

---

[2] Judge Nadeau's conduct while serving as Probate Judge in York County has resulted in violations of the Maine Code of Judicial Conduct and discipline on two previous occasions that resulted in three prior opinions.  *See In re Nadeau*, 2016 ME 116, 144 A.3d 1161; *In re Nadeau*, 2007 ME 35, 916 A.2d 200; *In re Nadeau*, 2007 ME 21, 914 A.2d 714.  His conduct regarding the abrupt rescheduling of Probate Court matters—at issue here pursuant to Count 4—also gave rise to an action currently on appeal to us.  *See LeGrand v. York County Judge of Probate,* No. YORSC-CV-2015-269 (Me. Super. Ct., York Cty., Mar. 29, 2016); *LeGrand v. York County Judge of Probate,* Law Ct. No. Yor-16-194 (Me. Apr. 26, 2016).

[3] The Maine Code of Judicial Conduct was promulgated in 1993 and became effective that year. *See* M. Code Jud. Conduct II(2) (Tower 2014).  The 1993 Code and amendments to it have since been

Count 1 alleged that then Judge-elect Nadeau's directive to the Register of Probate of York County not to include seven attorneys on the court appointed attorney list was motivated by his previous contentious relationship with those attorneys, in violation of Judicial Canons 2(B) and 3(C)(4);

Count 2 alleged that Judge Nadeau's removal of an attorney from cases to which she had previously been appointed was motivated by her association with an attorney with whom Nadeau had a contentious relationship, in violation of Canon 2(A) and (B);

Count 3 alleged that—in a case in which he had recused himself— Judge Nadeau ordered an attorney to destroy a lawfully obtained public document, in violation of Canon 2(A);

Count 4 alleged that Judge Nadeau's abrupt overhaul of the Probate Court schedule was motivated by his anger with the York County Commissioners when his request for a pay increase was rejected, in violation of Canons 1, 2(A) and (B), and 3(B)(8); and

Count 5 alleged that Judge Nadeau was, through oral and written orders, encouraging litigants before him to contact their county officials to lobby for increased court funding, which would also increase his salary, in violation of Canon 2(B).

[¶4] The Committee requested that Judge Nadeau be fined $10,000 and, by means of a conditional suspension from the practice of law, be barred from ever holding judicial office again.

---

superseded by a revised version that became effective on September 1, 2015. *See* M. Code Jud. Conduct II (Tower 2015). Because the conduct alleged in Jud-16-1 occurred before September 1, 2015, the version applicable to that proceeding is the 1993 version. Therefore, citations, quotations, and discussion pertaining to Jud-16-1 will be drawn from the 1993 version of the Code.

4

[¶5]  Following receipt of the report in Jud-16-1, the Court, in a procedural order dated February 22, 2016, appointed an Active Retired Justice of the Supreme Judicial Court (*Clifford, J.*) to preside as a Hearing Justice and to conduct a de novo hearing at which the Committee and Judge Nadeau could present evidence and argument regarding the allegations.  *See In re Ross*, 428 A.2d 858, 860 (Me. 1981).

[¶6]  A two-day evidentiary hearing was held on May 10 and June 16, 2016.  The Hearing Justice issued findings on July 15, 2016.  Based on those findings, the Hearing Justice concluded that the Committee had proved four of the five counts alleged in the Committee's report.  Pursuant to a subsequent procedural order, we requested that the parties file further argument on the merits of the Committee's charges and on what sanctions, if any, should be imposed if we were to conclude that a violation or violations of the Code had occurred.  The Hearing Justice's detailed findings and conclusions are now before us for consideration and decision after receiving briefs and, on February 10, 2017, hearing arguments by the Committee and Judge Nadeau.

B.    Jud-17-1 Proceedings

[¶7]  On March 16, 2017, approximately one month after oral argument in the Jud-16-1 matter, the Committee filed its second report.  This report

alleged a single violation of the Maine Code of Judicial Conduct by Judge Nadeau while he was a candidate for reelection as Probate Judge. The report had been filed after the Committee had notified Judge Nadeau of the alleged violation and, by letters dated November 13, 2016, and January 17, 2017, Judge Nadeau had waived a hearing before the Committee regarding the alleged violation.

[¶8] The report alleged that "on or about June 14, 2016, Judge Nadeau violated this Rule[4] by posting a message on his private law firm website that stated, among other things, 'It will be important for me to have lots of support, including donations to my campaign's committee known as the Committee to Re-elect Judge Nadeau (in care of [a named individual and address]).'" The Rule at issue in the report is Rule 4.2(C)(1) of the Code of Judicial Conduct (effective September 1, 2015),[5] which states:

(C) A candidate for election or reelection as judge of probate shall not:

(1) Personally solicit or accept campaign contributions or personally solicit publicly stated support.

---

[4] Some filings by the Committee indicate that the Rule alleged to have been violated is Rule 4.3(C)(1) of the Code of Judicial Conduct (effective September 1, 2015). It is evident that the Rule at issue is Rule 4.2(C)(1) of the Code of Judicial Conduct, quoted in this opinion. Correspondence attached to the Committee's report indicates that both the Committee and Judge Nadeau recognized that the Rule at issue is Rule 4.2(C)(1). Thus, no prejudice is evident from the incorrect citation of the Rule at issue in the Jud-17-1 proceeding.

[5] Because the conduct at issue occurred after September 1, 2015, the current Code of Judicial Conduct applies to the conduct alleged in Jud-17-1.

6

[¶9]  After the parties' initial filings and responses, we issued procedural orders confirming that (1) attachments A through F to the parties' filings constituted the factual record upon which a decision could be based; (2) no further argument before this Court was requested; and (3) a briefing schedule was set after which the report proceeding in Jud-17-1 would be decided along with the report proceeding in Jud-16-1.  The briefing schedule having been adhered to, with a final brief filed on May 22, 2017, the matter is now ready for decision.

## II.  FINDINGS AND CONCLUSIONS

A.    Judicial Misconduct in Jud-16-1

[¶10]  Pursuant to our February 22, 2016, procedural order, the Hearing Justice's findings "shall be treated in the same manner as findings made by a referee pursuant to M.R. Civ. P. 53(e)(2)."  Rule 53 instructs that the court "shall adopt the referee's findings of fact unless clearly erroneous."   M.R. Civ. P. 53(e)(2); *see also Hennessy v. Fairley*, 2002 ME 76, ¶¶ 17-18, 796 A.2d 41. Because the findings of the Hearing Justice are supported by the record, we adopt those findings.[6]  *See In re Nadeau*, 2016 ME 116, ¶ 4, 144 A.3d 1161

---

[6]  In this opinion, the Hearing Justice's findings are cited, by reference to page numbers, as "FoF."

(adopting findings of the Hearing Justice that are properly supported by the record).

[¶11]   Based on the adopted findings, we proceed to determine, on a de novo basis, whether Judge Nadeau violated the Code.  *Id.* ¶ 5.  In doing so, we "give no deference to the Committee's report, even though the Committee is charged with deciding administratively whether a charge has been established."  *Id*. (citation omitted).  The burden of proving the allegations contained in the report rests with the Committee.  *Id.*

[¶12]  "The delivery of justice and public confidence in the integrity of the judiciary necessarily rests on judicial officers' adherence to the ethical standards prescribed in the Code."  *Id.* ¶ 8.  The Judicial Canons are in place to provide an ethical guide to judicial conduct and ensure that judges act in a way that is "fitting of judicial office and fulfills their crucial responsibility to protect the public trust of a system that is founded on the rule of law."  *Id*.  As the Preamble to the 1993 Code made clear, the Canons provide "rules of reason."  *See* M. Code Jud. Conduct Preamble (Tower 2014).

> It is not intended . . . that every transgression will result in disciplinary action.  Whether disciplinary action is appropriate, and the degree of discipline to be imposed, should be determined through a reasonable and reasoned application of the Code and should depend on such factors as the seriousness of the transgression, whether there is a pattern of improper activity, and

8

the effect of the improper activity upon others or upon the judicial system.

*Id.* Thus, "the application of the Canons requires sensitivity to the extraordinarily important objectives they served, viewed in the particularized 'circumstances and conditions in which judges must operate.'" *In re Nadeau*, 2016 ME 116, ¶ 9, 144 A.3d 1161 (quoting Advisory Committee's Notes to Preamble, 1993 promulgation of former M. Code Jud. Conduct (effective Sept. 1, 1993), *available at West's Maine Rules of Court Annotated* 594 (Thomson Reuters 2016)).

[¶13] With these considerations in mind, and after review of the adopted findings and applicable Canons of Judicial Conduct, we concur with the Hearing Justice's conclusions as to Counts 1, 2, and 5. As to Count 3, we adopt the Hearing Justice's findings, but we conclude, as a matter of law, that Judge Nadeau's conduct addressed in Count 3 resulted in a violation of the applicable Canons of Judicial Conduct. As to Count 4, we adopt the Hearing Justice's findings, but we conclude, as a matter of law, that no violation of the applicable Canons of Judicial Conduct has been demonstrated.

[¶14] Robert M.A. Nadeau served as the elected Probate Judge in York County. (FoF. 2.) He was elected to that position in 1996, 2000, and 2004. (FoF. 2.) He lost the election for the Probate Judge position in 2008, but he was

once again elected in 2012. (FoF. 2.) The conduct at issue took place following his election in 2012 and prior to completion of his term and leaving office on January 1, 2017. *See* Me. Const. art. VI, § 6.

1.    Do Not Appoint Directive

[¶15]   Following his reelection in November of 2012, then judge-elect Nadeau sent an email to the York County Register of Probate, Carol Lovejoy, and directed that she not include seven attorneys on the list of attorneys eligible to receive court appointments for cases in the York County Probate Court. (FoF. 2-3.)   Regarding four of the seven attorneys—Thomas Elias, Pamela Holmes, Amy McGarry, and Vicki Mathews—judge-elect Nadeau stated in his email that he "lack[ed] confidence in their veracity."   (FoF. 3.)   As to the remaining three attorneys—Amanda Ramirez, Angela Thibodeau, and Sharon Ward—he stated that it would be best not to appoint them because they were associated in their law practice with Attorney Holmes.  (FoF. 3.)

[¶16]   Attorneys Elias and Holmes had been associated with Nadeau in his law firm and were later involved in litigation with Nadeau when they decided to leave his practice.  (FoF. 3.)  That litigation was very contentious. (FoF. 3.) Attorney McGarry also practiced in Nadeau's law firm, but she left and began practicing with Attorney Holmes.  (FoF. 4.)   Attorney Mathews had

supported Judge Nadeau's political opponent in the 2012 election for Judge of Probate and openly criticized Judge Nadeau in email correspondence that was circulated throughout York County. (FoF. 4.)

[¶17] Judge Nadeau asserted that his reason for not including the seven attorneys on the court-appointed list was because he would have to recuse himself from those cases, which the Probate Court budget could not support. (FoF. 4.) Months later—in April 2013—he sought and received an opinion from the Advisory Committee on Judicial Ethics, which informed him that in qualifying cases he should appoint attorneys for indigent persons impartially, even if doing so may result in his disqualification from cases and added expense to the court. (FoF. 5.) Because of that opinion, Judge Nadeau directed the Register that those seven attorneys were eligible to be appointed to cases before the court. (FoF. 5.)

[¶18] Although Judge Nadeau did rescind the do not appoint directive, damage had been done to all of the attorneys implicated. (FoF. 5.) Their credibility was called into question, and their reputations were harmed as a result. (FoF. 6.)

[¶19] Although Judge Nadeau may have referenced court budget concerns, he was also "substantially motived by ill will toward those seven

attorneys on the do not appoint list, especially the four whose credibility he questioned." (FoF. 6.) In particular, the directive to not appoint Attorneys Holmes and Elias was influenced by Judge Nadeau's past contentious relationship with them. (FoF. 3.)

[¶20] The Committee alleges this conduct violated Judicial Canons 2(B) and 3(C)(4). These Canons provided that "[a] judge shall not allow family, social, political, or other relationships to influence the judge's judicial conduct or judgment," M. Code Jud. Conduct Canon 2(B), and "[a] judge shall exercise the power of appointment impartially and on the basis of merit," *id.* Canon 3(C)(4).

[¶21] The email directive not to appoint, as well as the policy's continuation after Judge Nadeau assumed office until its rescission in April of 2013, constituted a violation of the Maine Code of Judicial Conduct. Judge Nadeau allowed his personal relationships with the attorneys to dictate how he appointed attorneys—a decision he did not base on merit or carry out in an impartial manner—which constitutes a violation of Canons 2(B) and 3(C)(4).

2.      Removal of Attorney Ramirez

[¶22]  In January 2013, shortly after Judge Nadeau assumed office, he ordered that Attorney Amanda Ramirez be removed from three active cases then pending before the York County Probate Court—cases to which she had previously been appointed.  (FoF. 6.)  Attorney Ramirez was practicing with Attorney Holmes at the time.  (FoF. 6.)  Although the removal of Attorney Ramirez from those three cases was vacated within one court day, the order caused her considerable consternation and concern.  (FoF. 7.)

[¶23]  The Committee contends that, under these facts, the removal of Attorney Ramirez violated Canon 2(A) and (B), which provided that "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," M. Code Jud. Conduct Canon 2(A), and "[a] judge shall not allow family, social, political, or other relationships to influence the judge's judicial conduct or judgment," *id.* Canon 2(B).

[¶24]  Although Judge Nadeau's decision was motivated, in part, by Probate Court budgetary concerns, it was also motived by his animosity toward Attorney Holmes and her law firm.  (FoF. 6-7.)  This conduct constituted a violation of the Maine Code of Judicial Conduct.  Because Judge Nadeau's actions

did not promote public confidence in the integrity and impartiality of the judiciary, and because he allowed his adverse relationship with Attorney Holmes to influence his judgment regarding another attorney, he violated Canon 2(A) and (B).

3.      Order to Destroy a Lawfully Obtained Public Document

[¶25]   In early 2013, Attorney Holmes learned about and lawfully obtained a copy of Judge Nadeau's November 2012 email directive to the Register of Probate not to include her and the six other attorneys on the court appointment list.  (FoF. 7.)  Based in part on this information, Attorney Holmes filed an objection and motion to transfer a pending case—a case on which she had previously been appointed—to a different probate judge.  (FoF. 7-8.)  Judge Nadeau originally denied the motion, but upon a motion to reconsider, granted the transfer to another probate judge.  (FoF. 8.)   In the order granting the transfer, Judge Nadeau directed Attorney Holmes to "immediately destroy" all evidence relating to the do not appoint directive that she had identified in her motion to transfer.  (FoF. 8.)  The order directed that she certify her compliance within seven days.  (FoF. 8.)

[¶26] Attorney Holmes did not comply with the order, and Judge Nadeau filed a complaint against her with the Board of Overseers of the Bar.  (FoF. 8.)

Attorney Holmes hired a lawyer to represent her during those proceedings. (FoF. 8.) The Grievance Panel found that Attorney Holmes violated M.R. Prof. Conduct 3.4(c),[7] but it dismissed the complaint with a warning. *See* Me. Grievance Comm'n, File No. 13-145 (Dec. 15, 2014); (FoF. 8).

[¶27] The Committee argues that the order to destroy a lawfully obtained public document violated Canon 2(A), which provided that "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." M. Code Jud. Conduct Canon 2(A).

[¶28] Although we adopt the findings of the Hearing Justice, we conclude as a matter of law—despite the Hearing Justice's conclusion to the contrary— that the conduct addressed in Count 3 is a violation of the Code. *See In re Nadeau*, 2016 ME 116, ¶ 5, 144 A.3d 1161 (observing that after adopting the Hearing Justice's findings, we determine de novo whether a violation of the Code has occurred).

[¶29] As the Grievance Panel observed, the document obtained was a public record as defined by the Freedom of Access Act, 1 M.R.S. § 402(3) (2016),

---

[7] M.R. Prof. Conduct 3.4(c) states, "A lawyer shall not . . . knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."

and was not within any of the statutory exceptions. *See* Me. Grievance Comm'n, File No. 13-145 (Dec. 15, 2014). Because the document Judge Nadeau ordered Attorney Holmes to destroy was a lawfully obtained public document, and because the order to destroy had been issued in connection with a case from which he had recused, we conclude, as a matter of law, that Judge Nadeau violated the Code.[8] *See* M. Code Jud. Conduct Canon 2(A).

4.     Overhaul of the Probate Schedule

[¶30]   On April 1, 2015, Judge Nadeau presented to the York County Commissioners a detailed proposal to increase the number of days that the York County Probate Court would be in session. (FoF. 9-10.) Part of this

---

[8] The Hearing Justice concluded that there was no violation of Canon 2(A) because of the Panel's finding that Attorney Holmes violated the Maine Rules of Professional Conduct, but he noted that it was "difficult . . . to understand" the basis for Attorney Holmes's violation, because Judge Nadeau had ordered her to destroy a public document in an ongoing case in which he had recused. (FoF. 9.) We agree that it is difficult to understand how Holmes's actions could be deemed a violation of the Rules of Professional Conduct, and we reach a different conclusion than the Hearing Justice about the effect of the finding of a violation.

The order to destroy the lawfully obtained public document also may have violated the Freedom of Access Act, which provides,

> Whoever intentionally removes any . . . document . . . belonging to or kept in any state office . . . or intentionally secretes, alters, mutilates, defaces or destroys any such . . . document . . . or, having any such . . . document . . . in his possession, or under his control, intentionally fails or refuses to return the same to that state office, or to deliver the same to the person in lawful charge of the office where the same was kept or deposited, shall be guilty of a Class D crime.

1 M.R.S. § 452 (2016). We do not address that issue further.

proposal included an increase in his annual salary from $48,498.77 to $90,000, for three court days per week,[9] or to make the Probate Judge position full-time at a salary of $119,476. (FoF. 10.) Although it is unclear when or to what extent the Commissioners considered Judge Nadeau's proposed changes to the court schedule and to his compensation, at the April 15 Commission meeting, Judge Nadeau's proposed schedule changes and pay increase were rejected with little or no discussion. (FoF. 11.)

[¶31]  As the Hearing Justice found, "within *minutes*" after the Commissioners' vote to reject his proposal, at 5:36 p.m., Judge Nadeau directed the Register of Probate, via email, to make immediate changes to the Probate Court schedule. (FoF. 11.) The changes resulted in an increase in the time between hearings on returnable probate estates, name changes, and adoptions involving home studies. (FoF. 11.) The changes included blocking off a half day every other week to give Judge Nadeau time to write and blocking off from 3:00 p.m. to 4:30 p.m. every Wednesday to provide time for walk-in emergencies. (FoF. 11.) The email concluded with, "We have to put users of the court ahead of county budget non-support." (FoF. 11.)

---

[9]  The court session schedule in place when Judge Nadeau earned the salary of $48,498.77 was two days per week, eight hours per day, for a total of sixty-four hours per month.

[¶32]  A few hours later, at 12:07 a.m., Judge Nadeau sent another email to the Register of Probate, directing her to change the days scheduled for Probate Court from Wednesdays and Thursdays to Mondays and Fridays from 8:00 a.m. to 4:30 p.m., with no hearings after 4:00 p.m.  (FoF. 11.)  The email required the Register to reschedule any hearings that had already been scheduled and to schedule future hearings to comply with the new schedule.  (FoF. 12.)

[¶33]  Later in the morning after the rejection of his proposed schedule changes and salary increase, at 8:46 a.m., Judge Nadeau sent yet another email to the Register of Probate criticizing the County's unwillingness to support his request for additional court time.  (FoF. 12.)  In the email, he ordered a full trailing docket list for trials and two to three days for cases to be addressed without trial.  (FoF. 12.)  The schedule was later finalized to include the first two Mondays of each month, the entire third week of the month, and the last Friday of each month.[10]  (FoF. 12.)  All hearings were to be concluded by 3:30 p.m., and any court holidays falling on a Monday would not be made up.  (FoF. 12.)

---

[10]  Testimony indicated that the first two Mondays would be for noncontested matters, the entire third week would be for contested matters, and the last Friday would be for research and writing.

[¶34] These changes to the Probate Court schedule did, in the long run, result in overall improvements. (FoF. 13.) Although the changes were beneficial to the court, the initial action by Judge Nadeau was motivated, "at least in substantial part, by his anger and disappointment at the County Commission's refusal to consider and implement the changes he proposed to them, to increase the scheduled court time and the judge's compensation." (FoF. 13.) The changes were made "immediately after" Judge Nadeau's pay increase proposal was rejected and were made without sufficient time for reflection, especially given that the schedule resulted in less time for cases to be processed and addressed by the Probate Court, and resulted in scheduling and rescheduling delays. (FoF. 13.)

[¶35] The Committee argues that the issue of Judge Nadeau's motivation for the abrupt schedule change is foreclosed by collateral estoppel because it was previously litigated and decided in *LeGrand v. York County Judge of Probate,* No. YORSC-CV-2015-269 (Me. Super. Ct., York Cty., Mar. 29, 2016). In *LeGrand,* the Superior Court (York County, *Warren, J.*) found that the schedule changes, in large part, were implemented by Judge Nadeau "to get back at the County Commissioners who had rejected [his] request for an increase in salary and court time." *Id.* at 10. Although Judge Nadeau argues that the factual issue was

not identical, nor fully litigated by him, the Hearing Justice here—independent of whether the Hearing Justice's findings should be bound by collateral estoppel—"reach[ed] the same conclusion as the Superior Court in *Legrand*, and [found] that the changes implemented by Judge Nadeau were motivated, at least in substantial part, by his anger at and disappointment with the County Commissioners." (FoF. 14.) Because the Hearing Justice independently made the same findings as the Superior Court, we need not further discuss application of collateral estoppel.

[¶36] The Committee contends that these actions violated Canons 1, 2(A) and (B), and 3(B)(8). These Canons provided that "[a] judge should . . . maintain[] . . . high standards of conduct . . . so that the integrity and independence of the judiciary will be preserved," M. Code Jud. Conduct Canon 1, "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," *id.* Canon 2(A), "[a] judge shall not lend the prestige of judicial office to advance the private interests of the judge," *id.* Canon 2(B), and "[a] judge shall dispose of all judicial matters promptly, efficiently, and fairly," *id.* Canon 3(B)(8).

[¶37] Although the schedule changes, or at least the final schedule change, resulted in an overall improvement to the Probate Court's efficiency, the Hearing Justice did not err in finding that the changes were motivated, at least in part, by Judge Nadeau's anger and disappointment with the County Commissioners after they rejected his request for increased court days and increased salary. (FoF. 13-15.) This motivation is demonstrated by the intemperate late in the day and midnight directives mandating scheduling changes that ultimately were replaced by a schedule adopted after more deliberate reflection and consultation. The initial changes were made without significant time for reflection, especially given that the new schedule resulted in less time for cases to be processed and addressed by the Probate Court, and resulted in scheduling and rescheduling delays.[11] (FoF. 13.) The initial decisions were made without consultation with the Probate Court staff, which Judge Nadeau has acknowledged was a mistake. (FoF. 13.)

[¶38] Relevant to the issues asserted by the Committee regarding Count 4, the Code of Judicial Conduct in place at the time provided as follows:

---

[11] Within twenty-four hours after the initial email that was sent moments after the Commission's decision not to adopt Judge Nadeau's proposal, Judge Nadeau sent two more emails that made additional adjustments to the Probate Court schedule. (FoF. 11-12.) One was sent at 12:07 a.m. and the other at 8:46 a.m. the morning after the decision. (FoF. 11-12.)

- "A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and shall maintain professional competence in judicial administration." *Id.* Canon 3(C)(1).

- "A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved." *Id.* Canon 1.

- "A judge . . . shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." *Id.* Canon 2(A).

- "A judge shall not lend the prestige of judicial office to advance the private interests of the judge . . . ." *Id.* Canon 2(B).

- "A judge shall dispose of all judicial matters promptly, efficiently, and fairly." *Id.* Canon 3(B)(8).

[¶39]  Like all Maine Probate Courts, the York County Probate Court has one part-time judge to manage the County's probate caseload.  In adjusting to the fluctuating demands on the Probate Courts, probate judges must exercise their authority to administer justice effectively, efficiently, and fairly given the constraints of the office.  *See id.* Canon 3(B)(8), (C)(1).  It is not a violation of the

Code of Judicial Conduct for a judge faced with administrative challenges to identify those challenges to the county commissioners or the public, or to change the court schedule to give priority to certain cases in a meaningful way, even if the establishment of new priorities disadvantages certain case types. Nor is it a violation of the Code of Judicial Conduct for a judge to inform others when the hours of operation supported by the county commissioners are insufficient to enable the court to reach the matters that require the court's attention in a timely fashion.

[¶40] The structure of Maine's Probate Courts creates a risk, however, that a probate judge may cross the line between proper administration and improper conduct advancing the judge's private interest. *See id.* Canons 2(B), 3(C)(1). If the Code of Judicial Conduct is applied in an overly restrictive fashion, the person who may best know whether a particular Probate Court is functioning properly—namely, that county's probate judge—will be constrained in speaking about the needs of the court if proposals designed to meet those needs could result in an increased salary for that judge.

[¶41] While the State court system has an institutional structure that allows its judges, including the Chief Justice, the Supreme Judicial Court, the trial court chiefs, and regional judges, to speak broadly of court needs,

*see* 4 M.R.S. §§ 1, 101-A, 157(1)(B) (2016); Establishment of Judicial Regions, Me. Admin. Order JB-08-01 (effective July 1, 2008), a probate judge must exercise judicial and administrative authority alone, *see* 18-A M.R.S. § 1-302 (2016).  This arrangement can leave the judge with a Hobson's choice: speak out about the need for more court hours, thereby arguing at the same time for greater judicial compensation, and risk a charge of violating the Canons by appearing to use the judicial position to advance the judge's own interests; or remain silent and fail to advocate for better public service within that county's Probate Court.

[¶42]  The matter now before us illuminates the challenges facing a probate judge who attempts to satisfy the broad and varied requirements of the position.  To be sure, the allegations in Count 4 that relate directly to the judge's responsibility to advocate for the public benefit are intertwined with Judge Nadeau's less salutary behavior that complicates the analysis.  Separate from those behaviors, however, there is no question that Judge Nadeau determined that additional court time was needed; that he provided information to the County Commissioners regarding the need for additional time; that the Commissioners declined to support more time (and thus more compensation); and that the judge responded by changing the schedule in order to address the

24

higher conflict cases, many involving children, that were not being reached. (FoF. 9-13, 15.)

[¶43] The difficulty arises from the Hearing Justice's finding that Judge Nadeau's actions in responding to the Commissioners' decision not to increase court hours were "impetuous" (FoF. 15) and were instituted, without first consulting with court staff or others, immediately following the County Commissioners' vote (FoF. 11-13).

[¶44] Judge Nadeau's intemperate behavior was unfortunate and could undermine the public's trust and confidence in the Probate Court. This particular jurist has been subject to disciplinary actions involving intemperate behavior on prior occasions. *See In re Nadeau*, 2016 ME 116, ¶¶ 13-19, 144 A.3d 1161; *Bd. of Overseers of the Bar v. Nadeau*, No. Bar-05-03, 2006 Me. LEXIS 167 (Me. Mar. 2, 2006).

[¶45] Given the context of the judge's actions, and the fact that members of the public ultimately benefitted from those actions, however, we conclude that the changes in court process instituted for purposes of operating within budget and time constraints, even though undertaken during a time of emotional agitation, did not, on these facts, constitute an ethical violation. Although the judge's "impetuous" behavior (FoF. 15) is regrettable, we

conclude that a violation of the Code of Judicial Conduct is not demonstrated with regard to Count 4.

5.      Urging Litigants to Lobby as Part of Court Orders

[¶46]   In May and June 2015, Judge Nadeau issued orders and made statements during Probate Court hearings urging litigants who were before him and seeking court action on pending cases to contact their County Commissioners to support increased funding for more Probate Court time so that pending cases in which litigants were seeking action could be resolved more quickly.  (FoF. 16.)  This urging to petition for increased funding, tied to litigants' requests for action in matters pending in the court where he presided, would directly benefit Judge Nadeau because increased court time meant increased judicial compensation, as his salary was based on scheduled court days and hours.  (FoF. 16.)

[¶47]  Specifically, in a May 4, 2015, order rescheduling a hearing, Judge Nadeau wrote that

> the one-day hearing may be rescheduled to an earlier date if one is available.  However, the County of York has expressed its unwillingness to fund needed additional court days.  The county commissioner serving [the litigant's] community is Michael Cote, and the County Manager opposing extra judicial funding is Gregory Zinser [telephone number].

In another order, Judge Nadeau instructed that the attorneys should

> report to the Register how much hearing time will be needed, so that scheduling may occur accordingly. As the York County Commissioners have refused to support funding for additional judicial time, any concern regarding delays should be directed to the parties' county commissioner, Michael Cote [telephone number] and Marston Lovell [telephone number].

In a different order, Judge Nadeau wrote that the "parties may wish to direct their concerns about scheduling delays to the county manager, Gregory Zinser, [telephone number], as he has been reluctant to support the funding of additional court time."

[¶48] Additionally, Judge Nadeau stated on the record during a hearing that "we've been asking for more court time—funding for more court time in this court, and we have not been successful with the County Commission so far." He went on to provide the contact information of the applicable county commissioner, and suggested that the litigants and attorneys "call . . . and discuss the problems with inability to accommodate a sooner hearing . . . [a]nd maybe if enough of these commissioners hear from enough people, including attorneys, about the problems here and the need for more court time, maybe they'll . . . be willing to support it and fund it."

[¶49] Many courts are underfunded. Judges talk about such underfunding regularly. Often judges urge members of the bar and the public to contact appropriate authorities who control the purse strings to support

increased funding. There is no ethical violation in urging such contacts to support increased funding for courts. As the Hearing Justice found, "efforts to persuade the County Commissioners, and the bar, and the public, that the court needs increased funding, would be legitimate and fully authorized" by Canon 5(A)(1)(f). (FoF. 16.) What sets this case apart from common efforts by judges to support increased funding for courts is Judge Nadeau's urging litigants in cases before him to contact county authorities to support funding that would have the direct effect of increasing Judge Nadeau's compensation.

[¶50] The Committee alleges that advising litigants to contact county authorities for this purpose violated Canon 2(B), which provides that "[a] judge shall not lend the prestige of judicial office to advance the private interests of the judge." M. Code Jud. Conduct Canon 2(B).

[¶51] Judge Nadeau's argument that his actions were consistent with the judicial canons because he was acting "to improve the law, the legal system, or the administration of justice," M. Code Jud. Conduct 5(A)(1)(f), is unpersuasive in light of the Hearing Justice's explicit findings. (FoF. 16.) "[Judge Nadeau] should not have been urging litigants in cases before him in such a manner, however. His judicial salary is so closely tied to the number of court days, and

he would so directly benefit from an increase in funds for more court days, [that] there was a violation of Canon 2(B)." (FoF. 16.)

[¶52] Although we recognize the difficult situation that the structure of the Probate Courts creates, *see supra* ¶¶ 40-41, the judge here went too far in urging advocacy on his behalf by litigants who needed and deserved his neutrality. Based on the Hearing Justice's findings, we conclude, as did the Hearing Justice, that Judge Nadeau violated Canon 2(B) because he was using the power and prestige of his judicial office to advance his own private interests.

B.     Judicial Misconduct in Jud-17-1

[¶53] In the summer of 2016, Judge Nadeau's law firm's website sought "lots of support" for his candidacy, "including donations to [his] campaign's committee." The record also reflects that the website solicitation "generated absolutely no donations"; the donations were directed to be made to a campaign committee, not to Judge Nadeau personally; and the website solicitation for donations was removed promptly after the Committee notified Judge Nadeau, in September 2016, that the website solicitation may have constituted an ethical violation.

[¶54]  Judge Nadeau argues that, because the application of the Code of Judicial Conduct should be "interpreted reasonably," and because he did not directly solicit any individual for contributions, and his campaign committee received no contributions as a result of the website solicitation, he should not be found to have violated Rule 4.2(C)(1).[12]

[¶55]  Rule 4.2(C)(1) expressly prohibits a candidate for election or reelection as a Probate Judge from personally soliciting campaign contributions.  *See* M. Code Jud. Conduct R. 4.2(C)(1).  It makes no difference whether the solicitation was successful or not.  The solicitation, not its success or failure, is what is prohibited.  Based on the undisputed facts, we conclude that Judge Nadeau violated Rule 4.2(C)(1) in soliciting donations to his reelection campaign through his personal law firm website.[13]

---

[12]  Judge Nadeau also argues that his personal solicitation of campaign contributions is speech protected by the First Amendment of the United States Constitution, citing *Williams-Yulee v. Florida Bar*, --- U.S. ---, 135 S. Ct. 1656 (2015).  *Williams-Yulee* addressed a provision of the Florida Code of Judicial Conduct directing that a candidate for judicial office "'shall not personally solicit campaign funds . . . .'"  *Id.* at 1663 (quoting Fla. Code of Jud. Conduct Canon 7C(1)).  The term is similar to the limitation stated in Rule 4.2(C)(1) of Maine's Code of Judicial Conduct.  The U.S. Supreme Court affirmed the imposition of discipline on Williams-Yulee for her mailing and posting online a letter soliciting voluntary contributions to her campaign, 135 S. Ct. at 1671-1673, holding that "because [the personal solicitation restriction] is narrowly tailored to serve a compelling government interest, the First Amendment poses no obstacle to its enforcement in this case."  *Id.* at 1672.

[13]  Although Rule 4.2(C)(1) was adopted effective September 1, 2015, the 1993 Code of Judicial Conduct included, at Canon 5(C)(3), a similarly worded prohibition that a Probate Judge candidate "shall not personally solicit or accept campaign contributions."  M. Code Jud. Conduct Canon 5(C)(3) (Tower 2014).  This prohibition would have governed Judge Nadeau's candidacy for the Probate Judge position in elections from 1996 through 2012.

[¶56] Considered in isolation, this violation of Rule 4.2(C)(1) would not likely generate any sanction beyond a reprimand. But considered in the context of Judge Nadeau's history of prior violations of his judicial ethical obligations, and given that this violation occurred while proceedings regarding the violations alleged in Jud-16-1 were pending before the Hearing Justice, this violation is further confirmation of a troubling pattern of disregard of ethical obligations that cannot be ignored in determining the appropriate sanction for the several violations of ethical obligations found in this opinion.

C.   Mootness

[¶57] To the extent Judge Nadeau argues that the issue of sanctions for his judicial actions is moot because he no longer holds judicial office, we have previously addressed and rejected this contention. *See In re Cox*, 658 A.2d 1056, 1057-58 (Me. 1995) (observing that the end of a judge's judicial tenure does not render the imposition of sanctions meaningless or extrajudicial when addressing conduct that occurred while serving in a judicial capacity).

[¶58] Because the issue of sanctions is not moot, as a matter of law, we do not need to expand the record to include evidence of Nadeau's intent to seek judicial office during the next election, and accordingly we deny the Committee's motion to do so.

D.    Sanctions

[¶59]   Having determined that Judge Nadeau violated the Code because of his do not appoint directive, as charged in Count 1; his removal from pending cases of a previously appointed attorney, as charged in Count 2; his order to destroy a lawfully obtained public document, as charged in Count 3; his issuance of orders urging litigants before him to lobby for increased court time, as charged in Count 5, and his personal solicitation of campaign contributions, as charged in the report in Jud-17-1, we next determine what sanctions, if any, should be imposed.  *See In re Nadeau*, 2016 ME 116, ¶ 44, 144 A.3d 1161.

[¶60]   In fashioning an appropriate sanction, "we examine multiple factors, including the judge's professional history, the context within which the violations occurred, the harm to the litigants and public, the seriousness of the violations, the judge's acknowledgement of the violations and understanding of the impact on the litigants, and the prospects for ensuring public trust and confidence in the judge's work in the future." *In re Holmes*, 2011 ME 119, ¶ 4, 32 A.3d 1011 (citing M. Code Jud. Conduct Preamble).  A sanction "must be sufficient to deter the individual being sanctioned from again engaging in such conduct and to prevent others from engaging in similar misconduct in the future." *In re Ross*, 428 A.2d at 869.

[¶61] We have the inherent authority to impose a variety of sanctions as judicial disciplinary measures—some of which Judge Nadeau has already been subject to. Available sanctions include, but may not be limited to, requirements for obtaining appropriate assistance or ethics education, censure, reprimand, forfeiture of funds, suspension from duties, and disbarment or the lesser sanction of suspension from the practice of law. *See, e.g., In re Nadeau*, 2016 ME 116, ¶ 50, 144 A.3d 1161 (censure, reprimand, suspension from judicial duties); *In re Nadeau*, 2007 ME 35, ¶ 7, 916 A.2d 200 (censure, suspension which would be reduced upon enrollment in the Maine Assistance Program and completion of judicial ethics course, forfeiture of $1,000); *In re Cox*, 658 A.2d at 1058 (Me. 1995) (disbarment)[14]; *In re Benoit*, 523 A.2d 1381, 1384-85 (Me. 1987) (censure, suspension, forfeiture of $1,000, required course in judicial ethics); *In re Kellam*, 503 A.2d 1308, 1312 (Me. 1986) (censure, suspension, forfeiture of $3,500); *In re Benoit*, 487 A.2d 1158, 1174-75 (Me. 1985) (censure, suspension, forfeiture of $1,000); *In re Ross*, 428 A.2d at 868 (suspension).

---

[14] Prior to disbarment, Cox was sanctioned for judicial misconduct on two separate occasions. *See In re Cox*, 553 A.2d 1255 (Me. 1989); *In re Cox*, 532 A.2d 1017 (Me. 1987).

[¶62]  This is now the fourth time that Judge Nadeau has appeared before us for ethical violations, and the third time for conduct that occurred while serving in a judicial capacity.  *See In re Nadeau*, 2016 ME 116, 144 A.3d 1161; *In re Nadeau*, 2007 ME 21, 914 A.2d 714[15]; *Bd. of Overseers of the Bar v. Nadeau*, Bar-05-03, 2006 Me. LEXIS 167 (Mar. 2, 2006).  Here, his actions were often carried out in an intemperate and vindictive fashion against former colleagues of his law practice and their associates.  Attorneys' reputations were harmed, and litigants before him were pressured to support his efforts to increase court resources and his compensation.  Judge Nadeau has not fully acknowledged the intemperate nature of his decisions.[16]

[¶63]  We have already acknowledged that "prior corrective efforts have not been effective in dissuading [Judge Nadeau] from engaging in intemperate conduct prohibited by the Canons."  *In re Nadeau*, 2016 ME 116, ¶ 49, 144 A.3d 1161.  This time, therefore, more severe sanctions are warranted.  It is hereby ordered that Robert M.A. Nadeau forfeit $5,000 and be suspended

---

[15]  We imposed sanctions for these violations in *In re Nadeau*, 2007 ME 35, 916 A.2d 200.

[16]  The intemperate nature of Nadeau's conduct is further evidenced by his post-hearing filing in Jud-16-1 supplementing his responses to questions posed to him during oral argument, which demonstrates that he did not appreciate the seriousness of his actions or how he was being perceived—even through oral argument.

34

from the practice of law for two years, commencing August 1, 2017, and shall

comply with the requirements of Maine Bar Rule 31.

The entry is:

> It is ORDERED that former York County Probate Judge Robert M.A. Nadeau forfeit $5,000 and be suspended from the practice of law in Maine for two years, commencing on August 1, 2017, for violations of Canons 2(A), 2(B), and 3(C)(4), of the 1993 Maine Code of Judicial Conduct, as alleged in Counts 1-3 and 5 of the Report of the Committee on Judicial Responsibility and Disability in Jud-16-1, and for violation of Rule 4.2(C)(1) of the 2015 Maine Code of Judicial Conduct as alleged in the Report of the Committee on Judicial Responsibility and Disability in Jud-17-1.

---

Cabanne Howard, Esq. (orally), Committee on Judicial Responsibility and Disability, Portland, for the Committee on Judicial Responsibility and Disability

Robert M.A. Nadeau (orally), pro se